## DAVIS *v.* SCHOOL-DISTRICT IN HAVERHILL.

The provisions of the statute of 1861, — that no person shall be considered as dwelling or having his home in any town, &c., for the purpose of voting, &c., at any meeting therein, unless he shall have resided within such town, &c., six months next preceding the day of said meeting; and of the act of 1849, that any person, who shall exercise the privilege of voting at any election in any town, &c., in this or any other State, shall be deemed by that act to have elected such town, &c., to be his legal residence for the purpose of voting, and shall thereafter be disqualified to vote in any other town, &c., in this State, until he shall have gained a new residence, — are not in conflict with the provisions of the constitution of this State.

Where the constitution has established a political right or privilege, but has not particularly designated the manner of its exercise, it is within the constitutional limits of the legislative power to provide such reasonable and uniform rules in regard to its exercise, as may be necessary to secure and protect the right or privilege thus established.

Where the building committee of a school-district had erected a school-house on land, a perfect title to which had not been secured to the district, and the district, with full knowledge of the facts, had ratified the action of the committee;—*Held,* that the

mere fact that a title to the land in fee, or for an indefinite time, good as against every body, had not been secured to the district, furnished no defense in an action brought by one of the committee to recover of the district for money paid out by him for the district in the erection of the school-house.

The members of a building committee of a school-district, paying out money and furnishing labor and materials, severally, under the direction of the committee for the erection of a school-house for the district, have several claims against the district.

A ratification of an act done by a person assuming to be an agent, by him for whom such person assumes to act, relates back, and is equivalent to a prior authority.

If the building committee of a school-district expend in the erection of a school-house for the district a larger sum than they were authorized to expend, a subsequent ratification of their action by the district will avail as between the parties, where no rights of third persons will be prejudiced, and will enable one of the committee to sustain an action brought by him against the district for money thus expended by him severally under the direction of the committee for the district, although such ratification took place after the commencement of his suit.

ASSUMPSIT.   The action was committed to an auditor, whose report was made part of the case.   The auditor allowed to the plaintiff various items in his specification, amounting to $208.94, with interest from the date of the plaintiff's writ.   The auditor in his report made the statement which follows:

"The counts in the plaintiff's declaration are general, for money had and received, money paid, &c., for interest on money, goods, &c., sold and delivered, labor and services done and performed, and materials furnished at the defendants' request.

The plea was the general issue, with a brief statement, setting forth that the plaintiffs' claim arose in building a school-house for the defendants, and that the plaintiff, with one Dunklee and one Warren, in building said house, acted as a committee for said district, to purchase land for a school-house for said district, and build a school-house thereon; and said school-house was built on land to which said district never had any right or title, which the plaintiff well knew before any part of his claim accrued, or any part of said house was built, or any preparations made for building; also, that the plaintiff's claim arose in building a school-house by the plaintiff, claimed by him to be for the defendants, upon land to which said district never had any right or title, which the plaintiff well knew; and that he never had any authority to build said house, or make said district liable therefor, until a title to said land should be obtained for said district.

I find that the defendant School-district No. 20, in Haverhill, has had a separate corporate existence but a few years, and that, soon after it was made a district, controversies arose between the different inhabitants in it in relation to building a school-house and other matters, and that they have had a great number of school-meetings, held at all times in the day, from six o'clock A. M., to six and a half o'clock P. M., at which the rival parties have tried to out vote each other, and carry their favorite measures.   Every effort has been made on both sides to procure the attendance of those qualified to vote at these meetings, and charges have been made on both sides against the other party, that persons were allowed to vote who were not legal voters in the district, and in some cases that those who were entitled to vote have not been allowed to do so.   The

plaintiff, with a portion of the district, made one faction, and one Daniel Hardy and another portion of the district made the other. At some of their meetings one party has been successful, and at others the other party, the legal voters in the district being nearly equally divided. The principal subject of controversy has been a school-house which has been built, and in connection with which this suit has arisen. They disagreed in regard to the size, plan, expense, and location of the house, as well as to the time when it should be built, and the committee that should build it.

I find that the plaintiff, Israel B. Davis, with Moses Dunklee and Charles P. Warren, had, under various votes, some regular and some irregular, been acting as a building committee in the season of 1859, and had selected a spot, and had commenced building a school-house and shed upon the same ground and plan on which and according to which it has since been finished. At a meeting of said district, duly notified for that purpose, and held December 5, 1859, it was " voted to rescind and annul all votes heretofore passed by said district;" also, to build a new school-house as soon as time and circumstances will permit, and to raise two hundred dollars to build a school-house in said district, and J. Titus, Joseph Hardy, and J. B. St. Clair, were chosen a building committee, and said Hardy and two others were also appointed a locating committee.

At a meeting of said district, duly notified, and held on the 29th day of December, 1859, it was

*Voted,* To rescind and annul all votes heretofore passed by said district relating to the building of a school-house therein, or any other vote passed up to the present time :

*Voted,* To dismiss the building and locating committee chosen on the fifth day of December, 1859 :

*Voted,* To accept and approve of the doings of I. B. Davis, M. Dunklee and C. P. Warren, who were chosen a committee to build a school-house and shed for said district, on the fifth day of November, 1859 :

*Voted,* To build a school-house and shed, and raise money therefor, and for purchasing land for the same, and decide upon the location thereof :

*Voted,* To choose a building committee to build said house and shed ; and Israel B. Davis, Moses Dunklee and Charles P. Warren were chosen said committee ; also, the same three men were chosen as a locating committee, to secure the title to the land for the district, and appraise the damages for said land :

*Voted,* To raise three hundred and fifty dollars for the purpose of building a school-house and shed in said district ; also, voted that the school-house and shed be finished in a good, workmanlike manner, of a common finish, and that the same be completed by the first day of June, 1860.

Under this vote the said committee proceeded and completed the house and shed, as they had before commenced it. They had located it where it now stands, which is on land in possession of said plaintiff at the time, but the title to which was in litigation between Melcher and Flanders. Application was made to said Melcher for

a deed, but he declined to give any until the legal title should be settled; and so the committee, although they appraised the land, have been unable to obtain any title to the same, except a quitclaim deed from said plaintiff, who was in possession of the land, to said district. The district have chosen another committee in 1861, to obtain title to the land, but they have been unable to do so; and October 26, 1861, the district voted to choose and did choose a committee of three, to petition the selectmen of the town to give title to the district of the land on which the school-house now stands. Said district has never been interrupted in any way in the use and occupancy of this land by any body. The district has occupied the house, and held their schools in it since it was completed, although said Hardy and some others have never sent their children there. A stove was set up in the school-house, and has been used there, and on the 8th day of March, 1862, the district voted, at a meeting duly notified and holden for that purpose, to raise thirteen dollars to pay for the stove and pipe in said house. Since the house was completed the school meetings have been notified and held in the same.

The house and shed were completed about June 1, 1860, and a meeting of the district was called to hear the report of the building committee, and to see if the district would raise more money to complete paying for it.

At this meeting the plaintiff and the other two upon the committee made report that the house and shed had cost $467.98, giving the items of expense; but the district declined to accept the report, and passed over the article to raise money, and adjourned without doing any thing; whereupon this plaintiff brought his suit, August 29, 1860, for the whole sum that had been expended, as appears by his specification.

Said Hardy and others employed counsel to defend this suit. I find that this committee, in building the house and shed, furnished or bought the materials, and hired the work, or did it themselves; that they have paid for nearly all the work and materials, some paying more and furnishing more than others, and the sums I have allowed the plaintiff as above are for what he has furnished in labor and materials, or paid to others for the same about said house and shed. I find that the plaintiff and one I. H. Davis were in company at the time, and that whatever the plaintiff has thus furnished and paid was from the partnership property. But the said I. H. Davis makes no claim upon the district for any thing; but it appears that the plaintiff took the property, paid the money with the assent of his said partner, and became responsible to the firm for the same, and charged it to the district as paid to the firm by him. I find that at a meeting of said district, duly notified for that purpose, and held July 27, 1861, at said school-house, the district voted to answer to and defend against an action or suit at law now pending, &c., (referring to the present action) — voted to adopt and ratify the proceedings of certain inhabitants of said district, to wit, Joseph Hardy (and six others, naming them), in answering to and defending against said suit thus far, and voted to continue said pro-

ceedings, and defend and pursue the same, and chose Joseph Hardy as agent to employ counsel and conduct said defense. These votes were passed by a majority of two, one of which was an illegal vote, the legal majority only being one. Another meeting was called at once, for the purpose of undoing all that had been done at the last meeting, which was held August 10, 1861, but the record shows that there was just a tie vote, and nothing was done.

Another meeting for the same purpose was at once called, and was held August 24, 1861, at which it was voted to rescind and annul all votes passed at the meeting held on the 27th of July, 1861; to dismiss Joseph Hardy, as agent for said district to defend said suit; also, to stop said suit, and to pay said plaintiff a fair compensation for building said house, and have all costs stopped: *Voted,* To pay said plaintiff the sum of three hundred and fifty dollars, and what interest said district No. 20 has in district No. 6, with costs and interest up to this time, and not to pay the costs already accrued by certain individuals procuring counsel to defend said suit thus far: also, voted to have a school, and school out the money in the treasury and in the hands of the collector, and to have the school in said school-house, and that the clerk notify Joseph Hardy of his dismissal as agent, &c. These votes were all passed by two majority except the last two, as to having the school in the school-house and the notifying Hardy of his dismissal, which were passed by three majority. Notice of the proceedings of this meeting were duly served on said Hardy, and on Mr. Felton, the attorney of record. Mr. Felton, however, still claims to appear for said district in defense, on the ground that there were several illegal votes cast on each ballot, which were counted with the majority, and that if only the legal votes had been counted, none of the votes recorded as having been passed at the meeting of the 24th of August could have been passed. He claims that four votes cast on that day, which it is admitted were cast and counted with the majority, were illegal votes, and that such votes should not have been received or counted; namely, those cast by Robert French, Pearson Wallace, Ira Clark and Daniel C. Dunklee. The defendants also claim that the vote of W. F. Flanders, which was rejected, should have been received, who would have voted, if allowed, with the minority. The plaintiff claims that Sumner Hardy, whose vote was received and counted with the minority, was not a legal voter there at the time. I find that said Flanders' vote was properly rejected, that said Hardy's vote was properly received, as were the votes of said French and said Wallace. I find that said Clark was not a legal voter in said district, and therefore his vote was improperly received and counted. The question, therefore, in regard to Mr. Felton's right to appear for the district depended entirely upon the question whether Daniel C. Dunklee was a legal voter in said district, August 24, 1861, and upon that question I find the facts to be as follows: Said Dunklee's father lived with his family in said district, and had for many years. Daniel C. was twenty-one years old in May, 1858, and voted in Haverhill in March, 1859, and 1860. In spring (March), 1860, he went to Manchester, N. H., to work in

the mills, returned here and helped his father a few weeks in haying that summer, then went back to Manchester to work. At the November election, 1860, he voted in Manchester for electors, &c. He made no application there to have his name put upon the checklist, knew nothing about it till election day, when some of his friends called upon him to go with them and vote, and he went and found his name on the list, and voted. He remained in Manchester after that until about July 4, 1861. He did not vote in March, 1861. When he left Manchester he returned to his father's, worked for him in haying that summer, and has made his father's house his home ever since, though a portion of the time he has worked out at other places. He has received his own wages when away from home since he was of age. Has not been married, has had his washing, mending and making mostly done at his father's, and has had no other home but his father's house, unless his residence in Manchester, and his voting there, as above stated, made that his home or legal residence, so that he had no right to vote in Haverhill again, until, by residence there a sufficient length of time, he should acquire such right. On the 24th of August, 1861, his vote was objected to, but was received by the moderator, and counted. If the court shall be of opinion that this vote was properly received and counted, then the votes of that day, as recorded, were legally passed, and Mr. Felton had no authority to appear for said district; but if his vote was not properly received and counted, then the vote relative to that matter would have been a tie vote, and nothing would have been legally done as to it, and this would leave Mr. Felton properly the attorney of the district under the vote of July 27, 1861.

It was agreed that, for the purposes of the trial, I should rule, pro forma, that Mr. Felton had the right to appear — the final question of his right being reserved for decision.

Mr. Felton objected to the allowance of the plaintiffs' claim, on the ground stated in his brief statement; also, upon the ground that the plaintiff could not maintain this action in his own name alone; that all he put in was partnership funds, and could only be recovered in the name of the firm of I. B. & I. H. Davis; also, that the suit should have been brought in the names of all the committee jointly against the district; and he also claimed that if any thing could be recovered in this suit, it could only be such proportionate share of $350 as Davis would be entitled to; that Davis or the committee could not bind the district beyond that amount.

If the court should be of the opinion that Davis can recover any thing in this suit, but that he can only have his proportionate share of $350, then I allow the plaintiff, as the share which he would be entitled to recover upon the items specified, the sum of $156.30, upon which interest is to be added from the date of the plaintiffs' writ."

It was agreed that said Moses Dunklee was clerk, and said Charles P. Warren prudential committee of said district from the first organization of the district to the time of the hearing before the auditor, and said Israel B. Davis was one of the defendants in

404   DAVIS *v.* SCHOOL DISTRICT.   [Grafton,

said suit, Melcher against Flanders, and never had any title or color of title to the land therein in controversy, beyond a mere naked possession, or a lease under said Flanders from year to year.

*H. Hibbard* (with whom was *J. S. Bryant*), for the plaintiff.

*Felton*, for the defendants.

BARTLETT, J.   The act of July 3, 1860, provides that no person shall be considered as dwelling or having his home in any town, &c., for the purpose of voting, &c., at any meeting therein, unless he shall have resided within such town, &c., six months next preceding the day of said meeting.   Laws of 1860, ch. 2341.   By chapter 850 of the laws of 1849, it is provided that any person who shall exercise the privilege of voting at any election in any town or place, within this or any other State, shall be deemed by that act to have elected such town or place to be his legal residence for the purpose of voting, and shall thereafter be disqualified to vote in any other town or place in this State, until he shall have gained a new residence, &c.   The plaintiff contends that these acts are in conflict with articles 28 and 30 of the constitution of this State, which provide that " every male inhabitant of each town, &c., of twenty-one years of age and upward, excepting paupers and persons excused from paying taxes at their own request," shall have the right to vote, &c., in the town, &c., where he dwells and has his home.

Where the constitution has established a political right or privilege, but has not particularly designated the manner of its exercise, it is within the constitutional limits of the legislative power to adopt all necessary regulations in regard to the time and mode of exercising it, which are reasonable and uniform, and designed to secure and facilitate the exercise of such right in a prompt, orderly and convenient manner.   Such a construction would afford no warrant for such an exercise of legislative power as under the pretense of regulating should subvert or injuriously restrain the right itself; but a statute merely providing a mode of exercising the right, easy and reasonable, and calculated to prevent error and fraud, and secure order, regularity and uniformity in the conduct of elections, and thereby give more security to the right itself, is not open to this objection.   *Capen* v. *Foster*, 12 Pick. 490.

It is hardly practicable in establishing the fundamental law of the State to fix precise regulations for its application, so minutely and accurately that they shall suffice for every case that may arise, and therefore the framers of our constitution only settled the general principles that should govern the right of suffrage, without attempting to enact in detail rules to regulate or secure its exercise ; and that instrument has fixed the qualifications of voters, but has not provided what shall be the evidence of such qualifications, or how or when it shall be furnished.   The great object of these provisions of the constitution is to extend to every citizen of proper age, with the exceptions specified, the right of suffrage, so that each may have his equal voice and proportionate weight at the polls.   Therefore it

is held that these provisions, though in terms broad enough to include all male inhabitants, &c., are not intended to include aliens not naturalized, and statutes prohibiting or excluding such from voting are not in conflict with them. *Opinion of Justices*, 8 N. H. 574; Act of 1813; Laws of 1815, sec. 250; Act of 1814; Act of 1814, 254; Act of 1827, secs. 1, 15; Laws of 1830, 446, 450; Rev. Stat., ch. 25, sec. 20; Rev. Stat., ch. 24, sec. 1. The spirit of these provisions is as much violated by the reception of votes from those not entitled to cast them, as by the exclusion of the votes of those who have the right of suffrage; for in either case each citizen properly qualified is not allowed his equal and proportionate weight in the conduct of public affairs. In construing the constitution, where a strict adherence to its letter would manifestly conflict with its spirit and intent, and would defeat its object, the object and purpose of the instrument are to be regarded more than the letter. 8 N. H. 574. If it were to be held that these clauses of the constitution were designed to contain all the regulations of the right of suffrage, a literal construction of them might in some cases allow citizens to vote more than once in the same election; but this would be as manifest a violation of the intent of the provisions of the constitution as the extension of the right of suffrage to aliens. Some legislation therefore is necessary to secure the object of these constitutional provisions; and we think that it has been left to the legislature and is within their constitutional power to provide such reasonable rules as shall be necessary to protect and secure the right of suffrage established by the constitution, and regulate the manner of its exercise.

Unless some uniform rules as to the evidence of residence are established by the legislature, numerous questions, not always free from doubt and difficulty, are left to be determined, as they may arise, by the many and shifting boards of town officials; and in such case the full, fair and effectual exercise of the constitutional right of suffrage might often be endangered from the want of certainty and uniformity in the rules of evidence and decision, and from the liability to error and exposure to fraud that would attend such a system of practice, if entirely unregulated by statute. Experience has shown the practical necessity of some such regulations as those in question, in consequence of the increase of population and of facilities for communication and migration in the State, and statutes similar to the act of 1860 have been in force, and have been generally acquiesced in, for the last thirty years. Laws of 1831, 34; Laws of 1838, 353; Rev. Stat. 82, sec. 4. Under the acts in question no citizen entitled to vote will ordinarily be deprived of the exercise of his right, except by his own voluntary act; and the acts themselves are mere regulations as to the evidence that the citizen dwells and has his home in a particular town, and their object is not to subvert or injuriously limit or restrain the right of suffrage, but to secure it in its full extent to those entitled to it, by preventing fraudulent voting; and we think that their provisions are fairly appropriate to effect this object. *McCulloch* v. *Maryland*, 4 Wheat. 413; 3 Story Const. 122; 1 Kent 250.

But it is said that the validity of these statutes is to be tried by the question whether, upon the facts stated, Dunklee would not have had a right to vote in the district but for these statutes. Now, whatever may be the answer to this question in the present case, it seems to us an incorrect test, since the application of it would exclude all power to prescribe check-lists, vote by ballot, and the like. Whether cases may arise to which these statutes could not be properly applied we need not inquire, for as they are not in conflict with our constitution when applied to the present case, which is but one of a large class of cases to which they are properly applicable (*Opinion of Justices*, 41 N. H. 555); Daniel C. Dunklee was not entitled, under section 6 of chapter 70 of the Revised Statutes, to vote in the meeting of August 24, 1861.

At the meeting of December 29, 1859, the school district ratified the action of the committee in locating the school-house and commencing its erection, and the votes show that they were passed with knowledge that a perfect title to the lot had not been secured to the district. The warrant for that meeting is not before us, but the auditor finds that the meeting was duly notified and held, and no question as to the sufficiency of the warrant for the vote is suggested; but the district, notwithstanding its vote at that time, and its subsequent ratification of the action of the committee, after the completion of the school-house, now objects that it has not acquired the title to the land on which the house has been built. The question presented here is not whether, as against the owner of the land, the district could enter upon it without having acquired title or obtained his consent; indeed it does not appear that the owner did not acquiesce in the erection; nor is the question here what may be the rights of the district against him, but simply whether, under the circumstances disclosed, the fact that the district has not a title in fee, or for an indefinite time, good as against every body, is a defense to this suit. We do not think that the broad position of the defendants, that a district can not become bound for the payment of money furnished to erect a school-house on land to which the district has not at the time acquired a title in fee, or for an indefinite time, good as against every body, is maintainable. We find no such limitation expressly imposed upon school districts by our statutes, and it does not seem to us required by the nature and object of their powers, or adapted to the exigencies that might arise. Here the district had and still has the power to obtain the title to the land, even against the owner's consent; Rev. Stat., ch. 71, sec. 7; Laws of 1849, ch. 853; and it has not been interrupted by any one in the use and occupancy of the land. We are therefore of opinion that this fact relied on by the defendants does not furnish a defense in the present case.

The defendants' objection because of the non-joinder of I. H. Davis seems properly abandoned, for upon the finding of the auditor it appears that the materials were furnished and the money paid for the district by the plaintiff, and not by the firm. This action is well brought by the plaintiff, without joining the other committee-men, for his claim is several. *Harris* v. *School District,* 28 N. H. 58.

If the committee were limited by the vote of December 29, 1859, to the $350, they can not recover for any amount expended beyond that sum, unless the district has ratified their action. *Harris* v. *School District; Wilson* v. *School District*, 32 N. H. 123; *Keyser* v. *School District*, 35 N. H. 482. Perhaps the vote of the district on the 8th of March, 1862, to raise money to pay for the stove in the school-house, when taken in connection with the facts of the report made at the meeting of June 1, 1860, and of the use of the house for the schools and meetings of the district since that report, might be evidence of a ratification of the action of the committee by the district; *Wilson* v. *School District; Keyser* v. *School District;* but however this may be, the vote of the district as to the school-house, which was duly passed on the 24th of August, 1861, after that report had been made, and the subsequent occupation of the house for the schools of the district, are quite sufficient to support the finding of such a ratification by the auditor. " A ratification of an act, done by one assuming to be an agent, relates back, and is equivalent to a prior authority." *Dispatch Line* v. *Bellamy,* 12 N. H. 232; Broom Legal Max. 676; Story on Agency, secs. 239, 242, 244 ; 2 Kent 616 ; *Fleckner* v. *Bank*, 8 Wheat. 363. And a ratification once made can not ordinarily be revoked. Story Agency, secs 242, 250. It follows that, as between the parties in such case, their rights and interests are to be treated as arising at the time of the original act, and not merely from the date of the ratification; and it can be no more an objection to such a ratification that it affects subsequent transactions between the parties, than to a confession of judgment; for a party has the right to take upon himself such consequences, if he chooses. It is therefore in general no objection that the ratification is subsequent to the commencement of the action, if the suit is founded upon the original act or contract and not on the act of ratification. *Russell* v. *Abbott*, 13 N. H. 477 ; and see *Merrifield* v. *Parrit*, 11 Cush. 598. The decisions in *Merriam* v. *Wilkins*, 6 N. H. 432, and *Hall* v. *Gerrish*, 8 N. H. 374, were in cases of the contracts of infants, and are treated as exceptions to the general rule. *Russell* v. *Abbott.* The case of *School District* v. *Bragdon*, 23 N. H. 515, cited for the defendants, has no bearing upon this point. There is nothing in the nature of a school district to prevent the application of the maxim cited, *Harris* v. *School District*, 28 N. H. 65, and in the present case its application would not be prejudicial to the rights of third persons. *Fiske* v. *Holmes*, 41 Me. 444; Story on Agency, sec. 245. There must, therefore, be judgment for the plaintiff on the report for $208.94, and interest from the date of the writ.

As to the point first discussed in the foregoing opinion, *Bell*, C. J., and *Doe*, J., doubted.