COPP v. HENNIKER.            { MARCH 13, 1875.

FLANDERS v. WARNER.

*Trial by jury.   Referee law of 1874.*

55  179
66   12
66   72
66  327

55  179
68  496
68  497
68  500
68  502
68  510

55  179
69   34
69  121

55  179
72  126

55  179
74  323
74  541
74  542

In an action against a town to recover damages for an injury caused by defect in a highway, the right of trial by jury is secured by the constitution of 1792.

That part of sec. 13, ch. 97, of the Acts of 1874, which provides for committing certain causes to referees for trial, is not in conflict with art. 20 of the bill of rights, or any other part of the constitution of the state, although the legislature have no power to pass an act which shall take away or impair the substance of the right of trial by jury, as used and practised when the constitution was adopted.

Queries as to whether or not the provision of said act, making the referee's report evidence in the trial before the jury, can be sustained.

These two actions—John B. Copp against the town of Henniker, and Caleb B. Flanders against the town of Warner—were case for injuries caused by defects in highways. At the October term, 1874, on motion of the plaintiffs, they were ordered to be referred, by FOSTER, C. J., according to the provisions of section 13 of the act of 1874, entitled "An act to abolish the present judiciary system and establish a new one." To this order the defendants excepted, on the ground that the provisions of said section are in conflict with the constitution, and void, and tendered this bill of exceptions, which was allowed.

*Tappan & Albin,* for the defendants in both cases.

Our position is, that the act not only seriously impairs, but that it virtually destroys the right of trial by jury, in any just sense in which the term " trial by jury " has always been understood and defined.

It is not our purpose to enter upon any extended encomiums upon the " inestimable right " (as our constitution, art. 77, terms it) of trial by jury. It is enough that it is preserved and guarded in the constitution of the United States, the constitution of New Hampshire, and in the constitutions of all the other states of the Union ; that it has the sanction of a thousand years' experience, more or less ; and notwithstanding the abuses to which it is subject by reason of the selection, sometimes, of incompetent jurors, yet we believe that a mode of trial wherein the parties upon issues of fact can have the average judgment of twelve good men and true, indifferently selected from the body of the county, to be the best of any yet devised, more satisfactory to the people than

any other, and more in accordance with the genius and spirit of American institutions. It is enough that the constitution of New Hampshire gives these defendants an unfettered right to such a trial—a right which we have demanded and still demand, and which cannot be swept away, either by judicial construction or by the arbitrary fiat of a legislative enactment. Nor have we any feeling or wish to oppose a judicious and well considered reference law. Such a law, properly guarded, giving the court some reasonable discretion as to what class of cases should be referred, and with a clause in other cases for an agreement by the parties, with a proper part of the expenses to be borne by the county as in jury trials, might, we think, be productive of good results, and help to rid the dockets of a great many comparatively unimportant cases which now encumber them. Art. 15 of our bill of rights is as follows : " No subject shall be arrested, imprisoned, despoiled, or deprived of his property, immunities, or privileges ; * * or deprived of his life, liberty, or estate, but by the judgment of his peers or the law of the land." Art. 20,—" In all controversies concerning property, and in all suits between two or more persons, except in cases in which it has been heretofore otherwise used and practised, the parties have a right to a trial by jury, and this method of procedure shall be held sacred." It will be said that these provisions are not violated, because by this law, in cases which are referred without the consent of the parties, " the same may, at the request of either party, be tried by a jury, after the report of the referee has been made." But the right which the constitution gives a citizen of a trial by his peers and by the law of the land, " means a trial by jury of twelve men, according to the course of the common law." 2 Kent's Com. 13, authorities and notes; *Taylor* v. *Porter*, 4 Hill 140 ; *East Kingston* v. *Towle*, 48 N. H. 57, and authorities *passim ;* Opinion of the Justices, 41 N. H. 550. This mode of trial implies that the jury are to hear the evidence, deliberate, and draw their own conclusions upon it. It is not a trial by jury, when the minds and opinions of jurors are prejudiced and influenced by the decision of the same case by some other tribunal. The right of trial by jury is good for nothing unless it is free, unincumbered, unrestricted, and unhampered. It is only mockery to say that a party's right to a jury trial is " held sacred " when it is clogged and impaired in the manner this act clogs and impairs it. He is sent, against his will, to a tribunal unknown to the constitution, has his case tried, has an award against him, is saddled, perhaps, with hundreds of dollars of costs, but is then complacently told that he may have his case tried by a jury, but on condition that at such trial by jury the report of the referee against him " shall be evidence of all the facts stated therein ; " but he may have the poor privilege of " impeaching " it if he can ;—in other words, the report of the referee makes a *prima facie* case against him on the start. The trial is not now upon the evidence in the case, and the deductions from it as drawn by the jury, but the conclusions and deductions of another tribunal have to be overcome and " impeached," and another element of evidence, foreign

to the real issue involved, introduced, which is calculated to prejudice the jury and prejudge his case, before it can be considered upon the evidence that legitimately belongs to it. And yet the trial by jury is "held sacred." It should be borne in mind, too, that the referees under this act are not even required to be sworn. Courts, jurors, and auditors are required to be sworn, but we suppose that that ancient custom has become obsolete, and goes by the board with the trial by jury. But let us look at the effect of this law in another light. I do not propose, nor is it necessary, to repeat here the arguments of Sir William Blackstone, 3 Com. 349, in favor of trial by jury. His chapter on that subject is probably the best exposition of that mode of trial ever written, and the arguments are as sound and the reasons in its favor are as cogent to-day as they were when first given to the world. One point which he makes we wish to refer to, however, as bearing directly upon the effect which this law will produce. He says,—"A competent number of sensible and upright jurymen, chosen by lot from the middle rank, will be found the best investigators of truth and the surest guardian of public justice. * * This preserves in the hands of the people that share which they ought to have in the administration of public justice, and prevents the encroachments of the more powerful and wealthy citizens. Every new tribunal, erected for the decision of facts without the intervention of a jury (whether composed of justices of the peace, commissioners of the revenue, judges of a court of conscience, or any other standing magistrates), is a step towards establishing aristocracy, the most oppressive of absolute governments." Now let us apply this idea to the law in question. It is contended that it does not impair the right of jury trial. Let us see: the practical result in the administration of this law has been, and will continue to be, the appointment in a large share of the cases of gentlemen of the highest standing in the community,—judges, lawyers, and others. This might all be well and proper enough if we are to go upon the theory that this mode of trial by referees is to take the place of and be a substitute for the trial by jury. But it is utterly inconsistent with the retaining unimpaired and "unfettered" the latter mode of trial;—in fact, let what may be said as to this right being still preserved, notwithstanding a cause must first be tried before this "new tribunal," we all know that the truth is, and the theory upon which appointments under the law are made is, that men of the "highest character," as it is termed, are selected, so that their decision will carry such weight as to make it final, and thus prevent any further trial by jury. Suppose a case should be referred to the chief justice of either the superior or circuit courts, or to an ex-chief justice, men whose legal ability and high standing in the community would justly give great weight to their opinions: but, suppose, nevertheless, that a party defeated before them, feeling aggrieved, and that justice had not been done him, should carry his case before a jury: the decision, or opinion if you please, of these eminent gentlemen goes in as evidence. Can any one say, in truth, that they would have no influence on the jury? On the contrary,

if some jurors were in doubt upon any point, or as to what the proper decision should be, would they not be quite likely to defer to such high authority, and give in their adhesion to the decision which had been made ready to their hand, and put in evidence before them? It is idle to deny that this would necessarily be so. True, the farce of a jury trial would be preserved, but the verdict would be not that of the jury, but of the chief or ex-chief justice. It might be a better decision of the case than the jury would have made, but don't let us call it a trial by jury. Therefore, if the trial by jury has outlived its day and generation; if it is no longer a " bulwark of our liberties; " if all that has been said in its favor by a long array of eminent jurists and statesmen has turned out a mistake; if, because, in cities and elsewhere, it is sometimes abused by the selection of stupid, ignorant, and corrupt jurors, the people have got sick of it, let the people be called together, and blot from our constitution a method of trial which is no longer " held sacred; " but let it not be done by indirection, as this law emphatically does it.

But we have heard the question suggested, If this law contravenes the constitution, is not the law in reference to auditors also unconstitutional? We answer, Not by any means necessarily so. Whoever had the tinkering of this law evidently had the idea that a sweeping law of this kind would stand upon the same footing as laws referring cases involving " long accounts," and the examination of vouchers, to auditors. But cases of this kind are everywhere treated as exceptional. In some jurisdictions they are upheld on the ground of practice before the constitution; in others, on the ground that they came within the rules of equitable cognizance where no jury is required; but in all, they have been, as will be seen, interpreted in such a way as not to trench upon the right of jury trial. In no other state has there ever been an attempt to create such a law as this, except in the state of Vermont, where it was passed one year and repealed the next, the supreme court also declaring the same to be unconstitutional. The reference laws of other states are carefully guarded so as not to affect this right,—as, for instance, the New York code provides for the reference of cases involving " long accounts," which has been held to apply only in cases of existing accounts between the parties, and that actions of tort are not referable—*Silmser* v. *Redfield*, 19 Wend. 21; and the Ohio code authorizes such a reference in " any case in which the parties are not entitled by the constitution to a trial by jury." 2 Rev. Stats. Ohio 1027.

It will be time enough to determine the constitutionality of the law referring cases of accounts to auditors, if the question should ever be raised. It is not, however, involved here. But we can easily see a clear distinction between such cases as involve the investigation of long accounts and the examination of vouchers, and cases like those at the bar. The action of assumpsit on long accounts is analogous to the old action of account. That was a form of remedy known to the common law, and in use before the adoption of our constitution. In

that action, after a judgment to account, the practice always was to send the case to an auditor or auditors, to state and adjust the accounts between the parties.  Our law in relation to auditors undoubtedly grew out of that practice, and cases arising under it might therefore well be held to come within the definition of " cases " referred to in art. 20 of the bill of rights, " where it has been heretofore otherwise used and practised."  But there are cases where it has been held that extending the jurisdiction of inferior tribunals, with the right of appeal, did not infringe upon the constitutional right of trial by jury; and these cases may be cited by the other side.  But these cases stand on entirely different footing.  It makes no difference how a case goes before a petty jurisdiction.  The result there has nothing to do with a trial above, and the jury are always instructed to that effect.  But here the decision below is made evidence, which shows that this law is in antagonism with all other legal analogies.

They then cited and commented on *Jones* v. *Robbins,* 8 Gray 329; Pet. of Mt. Washington Road Co., 35 N. H. 143; *Backus* v. *Lebanon,* 11 N. H. 19; *Baker* v. *Holderness,* 26 N. H. 110; *Dalton* v. *North Hampton,* 19 N. H. 364; *Knight* v. *Campbell,* 62 Barb.; *United States* v. *Pettibone,* 2 Paine C. C. 578; *The People* v. *Haws,* 37 Barb. 456; *Saco* v. *Wentworth,* 37 Me. 165; *Johnson* v. *Wallace,* 7 Ohio, Part 2, p. 62; *Tabor* v. *Cook,* 15 Mich. 323; *Work* v. *The State,* 2 Ohio St. 296; *Norval* v. *Rice,* 2 Wis. 22; *Exline* v. *Smith,* 5 Cal. 112; *McMartin* v. *Bingham,* 27 Iowa 234; *Swift* v. *Wells,* 2 How. Pr. 79; *Smith* v. *Brown,* 3 *id.* 9; *Miller* v. *Hoke,* 2 *id.* 171; *Plympton* v. *Somerset,* 33 Vt. 283.

*Sanborn & Clark,* for Copp.

I. Article 20 of the bill of rights provides that in cases like these, unless " it has been heretofore otherwise used and practised, the parties have a right to trial by jury."

In 1719 the general court passed a law, which was copied from an act of the great and general court of the province of the Massachusetts Bay enacted in 1693, imposing damages for injuries and loss arising from defective highways, in which it was provided that the damage should be " ordered and set upon them [the towns] by the justices of the quarter sessions who are hereby impowered thereto."  Province Laws 154, 155.  The usage and practice from 1719 to the time of the adoption of the constitution were of course in accordance with the law, and no legal reason exists why our legislature might not within constitutional limits empower our justices or any other proper tribunal to " order and set " the damages.  *Backus* v. *Lebanon,* 11 N. H. 19; Petition of Mt. Washington Road Co., 35 *ib.* 134.  Auditors were created by a statute passed in 1823, and were given certain powers. The act of 1874 created referees with the same powers but with an enlarged jurisdiction, embracing substantially all causes.  The constitutionality of the law of 1823 was never questioned, as the defendants say, because the practice of so auditing accounts obtained before the adop-

tion of our present constitution, or that of 1783. Why, then, should the constitutionality of the law of 1874 be questioned, so far as the cases in bar are concerned ?

II.   The act in question in no way deprives any party of his right to trial by jury, but expressly provides that either party may, upon request, have such trial after the report of the referee has been made in the same manner and with the same limitations as in the case of the report of an auditor. The law affects the remedy only, and does not destroy any rights. *Rich* v. *Flanders,* 39 N. H. 304.

If this law is unconstitutional, so is the law relating to the assessment of land damages in the laying out of roads, and many other laws; and so might a party complain that his right to a trial by jury had been taken away, who finds himself nonsuited or defaulted by a non-compliance with some of the many regulations of statute or rules of court with regard to the manner in which his case should be conducted before it reaches the jury.

If, then, the legislature could have empowered any tribunal to determine these cases, but have only applied a wholesome regulation to the manner in which they shall be tried, it would seem that there must be some reasonable doubt of the nullity and invalidity of the act of 1874, which doubt, in this instance, is in favor of the plaintiffs.

*Hawthorne & Greene,* for Flanders.

The inquiry in these cases is, Do the provisions of ch. 97, sec. 13, acts of 1874, regarding the reference of certain causes, and making the referees' report evidence for the consideration of the jury, conflict with art. 20 of the bill of rights, which secures the right of trial by jury ?   We consider these provisions in the order stated.

I.   Upon principle and the authorities, we make no doubt that if a trial be given in one court without a jury, with the right to appeal and to have a trial by jury in the appellate court, that is sufficient.   *Beers* v. *Beers,* 4 Conn. 535; *Steuart* v. *The Mayor* 7 Md. 500; *McDonald* v. *Schell,* 6 Serg. & Rawl. 240; *Jones* v. *Robbins,* 8 Gray 392; *Morford* v. *Barnes,* 8 Yerg. (Tenn.) 444; *Emerick* v. *Harris,* 1 Binn. 416. There can be no question, we think, that the principles on which these cases were decided apply in full force to this provision of the act of 1874.   Certainly the right to a trial by jury is in terms preserved; while upon no sound theory can it be held that a trial in the first instance, before referees, upon the order of the court, occasions any serious impairment of the right.   Wherefore we conclude that the provision for the appointment of referees works no infringement of art. 20.

II.   The right to be governed by existing rules of evidence is not a vested right.   Those rules pertain to the remedy which the state gives its citizens, and are not regarded as entering into or constituting a part of the contract, or as being of the essence of the right.   They are, therefore, at all times subject to modification and control by the

legislature, like other rules affecting the remedy; and the changes which are enacted may be made applicable to existing causes of action, even in those states where retrospective laws are forbidden.   Cooley's Const. Lim. 367, and notes; *Rich* v. *Flanders*, 39 N. H. 304; *Gibbs* v. *Gale*, 7 Md. 76; *Fales* v. *Wadsworth*, 23 Me. 553; *Ogden* v. *Sanders*, 12 Wheat. 249; *Webb* v. *Den*, 17 How. 577; *Delaplaine* v. *Cook*, 7 Wis. 54; *Kendall* v. *Kingston*, 5 Mass. 534; *Fowler* v. *Chatterton*, 6 Bing. 258.   As to what shall be evidence, and who shall assume the burden of proof, the power of the legislature is unrestrained, so long as its rules are impartial and uniform.   Cooley's Const. Lim. 368.

On this principle the legislature has power to make tax-deeds, duly recorded, *prima facie* evidence that all prior proceedings have been regular, and that the purchaser has thereby acquired a good title— *Hand* v. *Ballou*, 12 N. Y. 543; *Delaplaine* v. *Cook*, 7 Wis. 54; *Allen* v. *Armstrong*, 16 Iowa 508; *Adams* v. *Beale*, 19 Iowa 61; *Ambrey* v. *Rogers*, 9 Mich. 332; *Lumsden* v. *Cross*, 10 Wis. 289; *Lacey* v. *Davis*, 4 Mich. 140; *Wright* v. *Dunham*, 13 Mich. 414—and that rule may be changed as against existing deeds—*Hickox* v. *Tallman*, 38 Barb. 608— and defective records may be made good by the legislature—*Webb* v. *Den*, 17 How. 577.   Whence we conclude, whether it should be held under the act of 1874 that the referee's report shall be taken to make a *prima facie* case, or only as ordinary evidence for one party or the other before a jury, this provision of the act in no manner conflicts with art. 20 of the bill of rights.

Being able to anticipate neither the line of argument nor the authorities of the other side, we may desire to be heard further before the court.

LADD, J.   I. The plaintiff claims that in an action against a town for damages caused by a defect in a highway, neither party has a constitutional right to trial by jury; that such a case is specially excepted from the general rule by the constitution when it guarantees the right "except in cases in which it has been heretofore otherwise used and practised;" and to bring his case within the constitutional exception, he relies on the sixth section of the provincial act of 1719.   Province Laws, ed. 1771, pp. 154, 155.

1. But it is by no means clear that the true construction of that section did not give a right to trial by jury.   The court of quarter sessions, to which that section gave jurisdiction in this class of cases, was reëstablished by the judiciary act of 1692.   3 N. H. Prov. Papers 183.   That act provided,—1. That in the most trifling causes before a justice of the peace, either party might have a jury (as it was in the laws of 1682, on appeal—1 Prov. Pap. 450—and as it is on appeal to this day).   2. That in the quarter sessions, common pleas, and supreme court, "no person's right of property" should be determined, except by confession or default, "unless the fault be found by the verdict of twelve men of the neighborhood, as it ought of right to be by law."   (P. 186.)   3. That there should be a separate court of chancery, in which no provision was made for trial by jury.

Judge BELL (the highest authority on all matters of our provincial judicial history) says that it is not known that this law was ever repealed, and that it is supposed the court of chancery continued to exercise its powers till the revolution. *Wells* v. *Pierce*, 27 N. H. 512. This act of 1692 was, in language and effect, substantially reënacted by the judiciary act of 1699, which contained no repealing clause, and remained in force till the revolution, and was substantially reënacted in 1776, and again in 1785. 3 Prov. Pap. 218; Province Laws, ed. 1771, p. 5. · The act of 1692 was modified, in a few particulars of little comparative importance, by the act of 1699, and only so far as the latter was inconsistent with it. The judges serving under the act of 1699 were removed, not by a repeal of the act, but by the governor, on petition, on the thirty-first day of July ; the act of 1699 was passed Aug. 17. 2 Prov. Pap. 315, 316, 320, 321 ; 2 *id.* 86 ; Belknap's Hist. N. H., ch. XI, p. 156, ed. 1831. The act of 1699, being published in the editions of 1716 and 1771, was, of course, well known to Judge BELL ; and when he says that it is not known that the act of 1692 was ever repealed, his meaning evidently is, that it is not known to have been repealed in express terms, or by implication, except to the slight extent to which its provisions were incompatible with those subsequently adopted. There was, in the act of 1699, no modification of the provision requiring the fault to be found by a jury in the quarter sessions, common pleas, and superior court.

The history of the province, in the light of which the legislation must be viewed, renders it absolutely certain that no abandonment of the existing right of trial by jury, in the general jurisdiction of the quarter sessions, and other courts, was intended by the act of 1699. The courts were remodelled at that time for the express purpose of enabling the people to defend themselves against Allen claiming under Mason, and against such oppression as that which Moodey suffered at the hands of Cranfield a few years before. New Hampshire was given away by the crown before it was settled. The first settlers came as the servants of the foreign proprietors. In 1629 Mason became sole proprietor ; and the remnant of his title is recognized in the fifth section of the act of Feb. 27, 1786, for mending highways, the act of Jan. 16, 1787, about waste lands, and in the Rev. Stats. of 1842, ch. 143. The history of the Masonian controversy is a very large part of the civil history of the province. When Bancroft says that Mason's patent was pregnant with nothing so signally as suits at law—1 Bancroft's Hist. U. S. 329 ; that the civil history of the colony for a quarter of a century is a series of lawsuits about land ; that in 1699, and for years afterwards, followed scenes of confusion—trials in the colonial courts, resulting always in verdicts against the pretended proprietary, appeals to the English monarch in council, papers withheld, records of the court under Cranfield destroyed, orders from the lords of trade and the crown disregarded by a succession of inflexible juries,—he gives but a faint picture of that memorable controversy. 3 Bancroft's Hist. U. S. 82 ; 2 *id.* 116, 120.

The prosecution of Thomas Wiggins for throwing Barefoot, the "deputy governor," and Mason, the "proprietor," into the fire, whereby two of the deputy governor's ribs were broken, and one of his teeth knocked out, and Mason's foot was much scorched, and his periwig and clothes were burned; and for endeavoring to strangle Mason by grasping his windpipe, in high contempt of his majesty's royal authority; and a great variety of other turbulent transactions and popular outbreaks,—give a more lively and adequate representation of the universality and bitterness of the great controversy, which resembled the anti-rent war of New York—1 New Am. Cycl. 668—and kept the province in a constant state of irritation, with intermittent, violent convulsions, for a hundred years. 1 Prov. Pap. 578–582, 325, 381, 441, 442, 451, 476, 503, 509–576; 2 id. 351–355, 414–462; 3 id. 102; Belknap's Hist. N. H., chaps. 1, 2, 4, 6, 7, 8, 9, 11, 18, 21; 18 M. Law. Rep. 310. It was finally owing to juries, composed of parties in interest, that the people became owners of their homes, instead of being tenants of the Masonian proprietor. Twice they attempted to have jurors chosen by popular election. 1 Prov. Pap. 393, 449; 3 id. 73. Under Cranfield, juries, packed by officers in the interest of Mason, found verdicts for Mason. Afterwards, juries, packed by officers in the interest of the people, found verdicts for the people. The provincial legislators could not forget that Moodey was illegally convicted, in New Hampshire, by a servile and corrupt court; and that the seven bishops were acquitted, in London, by an independent jury. They were full of the English passion for trial by jury, intensified, if possible, by their experience in this country, and well illustrated by the code of 1680, which secured the right of trial by jury in trials of every kind, even in proceedings in admiralty—1 Prov. Pap. 395—chancery practice under the act of 1692 being a remarkable and conspicuous exception to the general rule of laws made by the people of the province.

The act of 1692 required that "the fault be found by the verdict of twelve men" before any person's "right of property" should be determined "by any of the aforesaid courts," of which the quarter sessions was one. "Right of property" there spoken of corresponds to "deprived of his property" in art. 15 of the bill of rights, and "controversies concerning property" in art. 20. Such expressions cannot be limited to suits in which the title of certain specific real or personal property is the question in issue; for in such litigation there is not necessarily any "fault," in the literal sense of the word, to be found by the jury. "A refusal to pay a debt is an injury to the property of the creditor," within the meaning of the constitution. 25 N. H. 540. A controversy concerning the amount of compensation to be paid for land taken for a public use, is a controversy "concerning property." 35 N. H. 143. From Magna Charta to the present day, trial by jury has been frequently guaranteed in general terms, that are not to be restricted to a narrow meaning and operation by any literal or illiberal interpretation. To decide that a party is to be deprived of his property on a judgment for damages, by the levy of an execution,

would be determining his " right of property," within the meaning of the act of 1692, when it provided that no person's right of property should be determined, " unless the fault be found by the verdict of twelve men." *East Kingston* v. *Towle*, 48 N. H. 57, 63, 64, 65.

By the natural and unavoidable construction of the judiciary acts of 1692 and 1699, considered either with or without the light of provincial history, there was, at the time of the passage of the highway act of 1719, a right of trial by jury in all cases, in the quarter sessions, common pleas, and superior court, where damages were claimed by one party as compensation for an injury caused by "the fault" of another. And very plain language would be necessary to show that the legislature intended, at that time, to make a case of contested liability for negligence and fault such an exception to the general law of torts then in force as that neither party should be entitled to trial by jury in such a case. Such an exception would be so strange and anomalous that the language creating it would be expected to be very explicit, and the motive very apparent.

The sixth section of the highway act of 1719 made a town liable to any person suffering damage in his person or team through the neglect of the town in not keeping in sufficient repair any highway which the town was bound to maintain and keep in repair, if the town had been notified of the defect, either in writing under the hand of two witnesses, or by presentment at the quarter sessions. The liability was imposed for actual neglect,—that is, negligence and fault in fact in not remedying a defect after written notice.

The question of liability involved the questions of the reasonable sufficiency of the way; notice of the defect, if there was a defect; neglect, for a reasonable time after the notice, to make the way reasonably sufficient. The questions (actual written notice, as contrasted with actual knowledge or fault in not having knowledge of the defect, being excepted) were the same that are now tried by jury, and have certainly been so tried since 1786, without any suggestion being made, so far as I am aware, that they are questions unsuitable to be tried by jury; and they were as suitable for that mode of trial in 1719 as during the last eighty-nine years. There is nothing in the nature of such a case from which an intent can be presumed to deny to both parties the trial secured in other cases of personal damages caused by legal negligence and fault.

Such a case came within the meaning of the provision of the act of 1692, requiring the fault to be found by a jury. If the sixth section of the act of 1719 had merely provided, as the highway act of 1786 did, that " the party aggrieved shall recover his or their damage in an action against such town," or that he " shall recover his damage in the quarter sessions, which court (or the justices of which court) are hereby empowered to take jurisdiction of such cases," both parties would have had the right of trial by jury secured by the general law. And they had that right under the sixth section of the act of 1719, unless the legislature intended, for no apparent reason, to say in that section

that the general law of the land should not be applied to this class of cases.

The first section of the act of 1719 is substantially a reënactment of a part of the act of 1698.   3 Prov. Pap. 210.

It provided for the removal of incumbrances from a highway at the offender's cost, to be levied by distress on his goods, and for a fine. He had a right to be tried in the quarter sessions—whether by jury or not, I will not undertake to say.   If he had no right to trial by jury, it must have been because his case was a criminal one.   In civil cases, the right was clear by the act of 1692.

Sections 2 and 3 of the act of 1719 were taken from the act of 1698, and the Massachusetts act of 1693.   3 N. H. Prov. Pap. 210; Mass. Ancient Charters 267.   Section 2 provides for laying out highways (apparently in more than one town) by the quarter sessions upon the report of a committee, the land damages to be assessed by that court if the town and land-owners did not agree.   The Massachusetts act provided for the laying out by a jury after the report of a committee, and the damages to be assessed by the jury.   The New Hampshire act evidently intended not to adopt the provision for laying out by a jury. But it would seem that the damages were to be assessed by a jury if the land-owner so wished; for the 3d section provided for the laying out of other highways (apparently public highways within one town) by selectmen, empowered the quarter sessions, on application of a land-owner, to make inquiry as to his damage, by a jury, and to make final order thereon.   There could be no reason for giving a jury trial in one case and not in the other; and when the 2d section says the court shall, on the land-owner's application, hear and determine, according to right and justice, the land damages caused by a road in more than one town ; and the 3d section says the court shall, on the application of the land-owner, settle his damages by a jury, for a road in one town, the discrepancy must be attributed to the inartificial style of the act, and not to the legislative intent.

The fourth and fifth sections were taken from the Massachusetts act of 1714.   Ancient Charters of Massachusetts 403.   They provide for laying out " private highways " by selectmen, and for laying out highways within one town, and private highways by the quarter sessions when the selectmen unreasonably delay or refuse to lay them out, and that compensation shall be made to land-owners as the parties may agree, or otherwise, as shall be ordered by the court of quarter sessions of the peace upon inquiry into the same by a jury.   The various sections of this act providing for the assessment of land damages by a jury, and a similar provision in the act of 1766 (Laws 1771, p. 197), were overlooked by the court when they said, in *Backus* v. *Lebanon*, 11 N. H. 27 (Parker, C. J., delivering the opinion),—" No provision is found for the intervention of a jury in cases of that character.   It had therefore been ' otherwise used and practised ' for nearly a century and a half before the adoption of the constitution."   These provisions were overlooked, notwithstanding the act of 1719 was cited and relied upon,

by the court as a ground of decision of another point in *Backus* v. *Lebanon;* and that error should make the court extremely cautious in asserting, without the most thorough and critical examination, that a party in any case was not entitled to trial by jury before the adoption of the constitution.

The decision in *Backus* v. *Lebanon*, that there is no constitutional right of trial by jury in the assessment of highway land damages, rests not upon provincial legislation, but upon the highway acts of 1786 and 1791, which gave no jury trial, and changed the usage and practice before the adoption of the constitution in 1792. *Baker* v. *Holderness*, 26 N. H. 110. Under the provincial acts of 1719 and 1766, a right of trial by jury was given when the parties could not agree, and the land-owner applied to the quarter sessions for relief. If the land-owner did not apply, the town had no need of a trial of any kind.

The sixth section of the act of 1719 is substantially a copy of the fourth section of the Massachusetts act of 1693. Anc. Ch. of Mass. 267, 269. Its language is, that the damage is "to be ordered and set upon them by the justices of the quarter sessions, who are hereby empowered thereto." A trial by jury is not provided for by this section.

The language, taken with literal strictness, does not entitle either party to such a trial. But there are grave reasons for doubting whether the language was meant to do anything more than confer jurisdiction on the quarter sessions in this class of cases, leaving the mode of trial to the general law, which, as we have seen, would give a right of trial by jury.

This section, like most of the act, is not a piece of New Hampshire composition. What it meant in Massachusetts I am not informed ; and I do not consider it certain that the legislature of New Hampshire, with the means of communication existing in 1719, copied this section with full knowledge of its received construction in Massachusetts, and a settled purpose that it should have the same construction here. It seems to me more likely that, so far as this point of trial by jury was in their minds, they copied this section with the intent that it should be a piece of homogeneous New Hampshire legislation, and that the mode of trial under it should not be in strange and striking contrast with their own settled and uniform system of general law, which gave trial by jury in all cases that were at all analogous to this.

The use of the word "justices" instead of "court" cannot be regarded as of any significance. The Massachusetts act, from which the fourth section was copied, provided for compensation to be made as the parties may agree, or otherwise, as shall be ordered by the justices of the court of general·sessions of the peace as provided by the act of 1793, which gave a right to jury trial. And throughout the provincial legislation of Massachusetts and New Hampshire, the words "justices" and "court" are frequently used as synonymous, especially in relation to the general sessions, which was composed of justices of the peace. The court is described in cases of jury trial, sometimes as the justices of the peace at their sessions, sometimes as the justices of the

same courts in quarter sessions, and in a variety of other ways. There was no uniformity in its description. And when we consider the previous sections of the same act, giving expressly or recognizing the right of trial by jury; and the second section, evidently intended to recognize it although not naming it; and the general law of the land, which established the right in cases arising under section 6, unless that section excepted this class of cases from the general law,—I am not prepared now to say that that section should be construed to break in upon the uniformity of the system of trial by jury.

Still the question is, not how this court would now construe it, but whether it was construed to deny the right of trial by jury from 1719 till 1786, when it was repealed; and on that point I have no special information. If there was such a practice under it as to show that it was generally understood to deny the legal right of a jury trial, such an understanding would be conclusive as to the bearing of that act on the constitutional aspect of the act of 1874.

2. But the true construction of the act of 1719 and the general understanding of its meaning are wholly immaterial, because it was repealed in 1786; and if by the usage and practice before 1786 there was no right of jury trial in consequence of the peculiar language of the act of 1719, that usage and practice were changed by the act of 1786, and remained changed till the adoption of the present constitution.

The constitution under which this case arises is the constitution of 1792. In that year the whole of the present constitution, and not a mere amendment of the constitution of 1784, was submitted to the people and adopted in town-meetings; and when it says " heretofore otherwise used and practised," it means before its adoption in 1792. So far as the meaning of " heretofore " and the date to be reckoned from are concerned, it is immaterial whether some or all of the constitutional provisions then adopted were new, or whether they were copied from the New Hampshire constitution of 1784, or the Massachusetts constitution of 1780, or the declaration of independence, or Magna Charta.

On the twenty-seventh day of February, 1786, the legislature passed four acts in relation to highways: one, repealing " all laws heretofore in force within this state relative to highways, except " the act of January 10, 1766, in relation to exchanging highways, another for laying out highways, another for mending highways, and another to prevent encroachments upon highways. The act of 1719, on which the plaintiff relies, was among those repealed. The 4th section of the act for mending highways, February 27, 1786, provided " that in case any special damage shall happen to any person or persons, or to his or their teams or carriages by means of the insufficiency or want of repairs of any highways or bridges, in any town or parish within this state, the party aggrieved shall recover his or their damage in an action against such town or parish." This was the provision substi-

tuted for the 6th section of the act of 1719. It was reënacted in the 8th section of the act of July 3, 1829,—the word " parish " being omitted,—and in the Rev. Stats., ch. 57, sec. 1, and in the Gen. Stats., ch. 69, sec. 1, with slight alterations of language not affecting the meaning.

In giving to the party damaged a right of action against the town, without specifying the form of the remedy, or the court in which it was to be sought, or the course of the judicial proceedings to be adopted, the legislature gave a right of action to be pursued according to the usual practice in cases of torts, and the ordinary course of the common law. It has never been doubted, so far as I am aware, that the statute of 1786, and all its subsequent reënactments, give both parties a right of trial by jury, not, indeed, in express terms, but by natural and necessary implication. Of the universal understanding on this point there can be no doubt. It is impossible to hold that the act of 1786 did not change the previous practice, if the previous practice was to try this class of cases without a jury. And the decision in *Baker* v. *Holderness*, 26 N. H. 110, 114—where the error of *Backus* v. *Lebanon* was corrected—is conclusive upon the point that the right to a trial by jury, existing in this class of cases, from 1786 to the adoption of the constitution, does not leave this class " among the cases in which it has been heretofore otherwise used and practised," but shows it to be among the cases in which this mode of procedure is to be held sacred.

*Pierce* v. *State*, 13 N. H. 536, 442, is also an authority to the point that " heretofore " in the constitution means before 1792, and that " the laws which have been heretofore adopted, used, and approved in the province, colony, or state of New Hampshire, and usually practised on in the courts of law," refers to the provincial laws as modified by statutes passed in the period between 1776 and 1792. It cannot be doubted that the act of 1786 gave the right to a trial by jury in this class of cases, and that this case is not one of the " cases in which it has been heretofore otherwise used and practised," within the meaning of the constitution. Sedgwick on St. & Const. Law, 489 n, 2d ed.

II. Taking this case, then, as one in which the parties have a constitutional right to trial by jury, the question is, whether any provision of the 13th section of ch. 97, Laws of 1874, infringes the constitutional right.

A compulsory arbitration under that section is not the jury trial guaranteed by the constitution. And this is distinctly admitted in that section, for it provides what shall be done when the parties are entitled to a trial by jury.

Though the legislature may, by not enacting any laws establishing courts, juries, or other tribunals, whose existence depends upon statutes, leave the people without trial by jury, or any judicial tribunal, trial, process, or remedy, they cannot make a constitutional jury of less than twelve men. 41 N. H. 550; 1 Bennett & Heard Ld. C. C. 482, 2d. ed. The reason of this is clearly given in 41 N. H. 550; and the

views of our court, as expressed in that opinion, are also strongly set forth in *Work* v. *The State,* 2 Ohio St. 299, where the court say,—"The institution of the jury referred to in our constitution   *   *   is precisely the same in every substantial respect as that recognized by the great charter, and its benefits secured to the freemen of England, again and again acknowledged in fundamental compacts as the great safeguard of life, liberty, and property ; the same brought to this continent by our forefathers, and perseveringly claimed as their birthright in every contest with arbitrary power, and finally, an invasion of its privileges prominently assigned as one of the causes which was to justify them in the eyes of mankind in waging the contest which resulted in independence. Nor did their affection for it diminish or cool. They made it a corner-stone in erecting the state governments.   *   *   Our opinion is, that the essential and distinguishing features of the trial by jury, as known at the common law, and generally if not universally adopted in this country, were intended to be preserved ;   *   *   that it is beyond the power of the " legislature " to impair the right or materially change its character."

" The language of the constitution is to be understood in the sense in which it was used at the time of its adoption ; and as, at that time, both by the common law and by the settled usage here, the right of voting for public officers was a right that must be exercised personally by the voter at the meeting held for that purpose," it was held that the right of suffrage, established by the constitution, could not be exercised by proxy.   44 N. H. 635.

" The trial by jury, secured to the subject by the constitution, is a trial according to the course of the common law, and the same in substance as that which was in use when the constitution was framed." *East Kingston* v. *Towle,* 48 N. H. 64.   And a trial by a jury of eleven men, or a trial in which the verdict is given by the agreement of eleven out of twelve jurors, would not be a trial by jury in the constitutional sense.   41 N. H. 550 ; 2 Story Const., sec. 1779, n 2 ; Sedgwick on St. and Const. Law 493 n, 2d. ed. ; Cooley's Const. Lim. 319 ; *State* v. *Peterson,* 41 Vt. 522 ; 27 Vt. 359.   A statute might be passed calling eleven men a jury, and declaring that a jury should consist of eleven men and no more, or that, if eleven out of twelve jurors could agree, they might return a verdict; but such a statute would be an infringement of the constitutional right of trial by jury, because such a trial must be " according to the course of the common law, and the same in substance as that which was in use when the constitution was framed ; " and a trial by a jury of eleven men, or a trial with the verdict given by eleven men out of twelve, would not be a trial " according to the course of the common law," and would not be " the same in substance as that which was in use when the constitution was framed." So much is settled, and so much is so elementary that there could be no difference of opinion about it, if there were no authorities on the subject.   As to the general principle that the legislature may adopt regulations giving security to a constitutional right, and facilitating

the exercise of it, there can be no doubt or controversy. *Davis* v. *School District*, 44 N. H. 398 *(Capen* v. *Foster*, 12 Pick. 490). It is equally certain that they cannot, under pretence of regulating, injuriously limit or restrain it.

In 25 N. H. 537 is an opinion of the court, given in answer to a resolution of the senate requesting their opinion as to the constitutionality of a bill then pending before the senate. The court say (p. 540, 541),—"The bill designs to subject a party appealing from a judgment of conviction by a justice of the peace to a double penalty, or to an increased penalty, if judgment be rendered against him in the court above. \* \* Unless the right of appeal can be wholly taken away, and the party deprived of all right to a jury trial by closing the only path by which it can be reached, this provision cannot be supported." The increase, *i. e.*, the amount added to the penalty, would be a penalty imposed upon the party as a punishment for his claiming and exercising his constitutional right of trial by jury. "A law which should declare it a crime to exercise any fundamental right of the constitution, as the right of suffrage or the free exercise of religious worship, would infringe an express rule of the system." *Wynehamer* v. *People*, 13 N. Y. 419.

If the legislature should say,—"Trial by jury is a useless, expensive, inconvenient, and bad institution ; and, for the purpose of deterring parties from claiming their constitutional right to it, be it enacted, that all actions shall be brought before a justice of the peace, or referred by the court to an arbitrator ; and any party claiming a trial by jury shall be liable to a certain penalty to be recovered in a *qui tam* action," or " shall pay certain costs," or " shall have an increased judgment rendered against him unless he prevails," or " shall give security for costs, or debt, or judgment," or shall in any way be subjected to any expense, liability, inconvenience, or disadvantage, before, after, or during the trial by jury,—no one would suppose that a statute, thus expressly declaring its unconstitutional purpose of discouraging, obstructing, hindering, and preventing the exercise of a constitutional right, could be sustained. And if the statute, instead of expressly declaring its unconstitutional purpose, were silent on that subject, or, if it expressly declared that its purpose was to secure and facilitate the constitutional right, its silence, or its explicit averment in relation to its purpose, would by no means be conclusive on that point. If the burden or disadvantage imposed could have no operation or effect except to prevent, hinder, obstruct, or discourage the exercise of the constitutional right, it would operate as a penalty upon the party claiming that right, and would of course be an infringement of the right itself.

The opinion of this court, reported in 25 N. H. 540, 541, is supported by the decision in *Greene* v. *Briggs*, 1 Curtis C. C. 311, 327, 328, where Judge CURTIS (and Judge PITMAN) held a statute unconstitutional which imposed an increased penalty upon the party appealing from a justice of the peace, on the ground that the additional penalty operated as and could be considered nothing but a penalty inflicted

upon a party for exercising his constitutional right of claiming a trial by jury. " It is manifest," says Judge CURTIS, " that this right is not secured by the constitution, but is wholly under the control of the legislative power, if it can annex penalties to the exercise of the right." To the same effect is *State* v. *Gurney*, 37 Me. 156, 163, 164.

There is a class of cases, which might, at first sight, seem to constitute a modification of these principles, but which, as a slight examination will show, fall within the general rule.

The general doctrine already quoted as laid down in *East Kingston* v. *Towle*, 48 N. H. 64, is well stated by Mr. Pomeroy, in a note in the 2d ed. of Sedgwick on St. and Const. Law 487, thus : " It is the *right* of trial by jury which exists and is preserved ; and what that right is is a purely historical question, a fact to be ascertained like any other social, legal, or political fact. As a constitution speaks from the time of its adoption, the fact of the right to jury trial, which is ascertained to have existed at that time, must necessarily determine the meaning of the clause which recognizes and preserves the right. The courts seem, with great unanimity, to have accepted this general principle of construction." It is useless to quote authorities at length in support of a proposition on which the entire legal profession of the country are agreed.

There are, in certain cases, various statutory provisions with which parties must comply in order to obtain a jury trial, and which are valid because their requirements were incidents of the historical right which the constitution adopted and guaranteed. " There shall be paid by the plaintiff or appellant, for the trial of every action by jury, before the trial, to the clerk, for the use of the county, to be taxed in the bill of costs of the party paying the same, five dollars." Gen. Stats., ch. 272, sec. 22. On what ground is this statute constitutional ? Why is not a jury fee a penalty imposed upon the party for claiming his constitutional right of jury trial ? The history of previous legislation shows that the " appellants," who are required by our General Statutes to pay jury fees, are the appellants in civil cases only. Suppose the legislature should enact that in criminal cases of indictment, any party demanding a jury trial should pay a jury fee, and on his failing to do so should be tried by the court or a referee, such a statute would doubtless be held to be an infringement of the right of trial by jury : but on what grounds would it be so held ? How could it be held that a jury fee is constitutional in a civil case, and unconstitutional in a criminal one ? The constitution, in express terms, says nothing about a jury fee in either case, and there is nothing in its terms from which any distinction can be implied between a jury fee in civil and a jury fee in such criminal cases. In those civil cases in which trial by jury is a constitutional right, that right is as sacred as it is in criminal cases. Its sacredness is not a matter of degree : it is absolute. The question is, What is the sacred right ? and that is " a purely historical question." The right is the historical right enjoyed at the time it was guaranteed by the constitution. " The trial by jury, secured   *   *   by the con-

stitution, is　*　*　the same in substance as that which was in use
when the constitution was framed"—*East Kingston* v. *Towle ;* and the
trial by jury, in use when the constitution was framed, and for a long
time before,—as well as ever since,—was one in which a jury fee was
required in civil and not in criminal cases of indictment.   3 Prov.
Pap. 183, 184, 214, 215; Prov. Laws (ed. 1771) 85, 86, 168; act of
April 9, 1777, for continuing in force the general system of provincial
law (p. 160, ed. of 1789); act of January 16, 1787, in amendment
of the acts establishing fees (p. 91, ed. of 1789); act of February 9,
1791, regulating process and trials in civil causes, sec. 10 (p. 90, ed.
of 1797); act of February 9, 1791, regulating fees (p. 119, ed. 1797);
act of February 16, 1791, sec. 7 (ed. of 1797, p. 129); act of Decem-
ber 16, 1796 (p. 462, ed. of 1797); act of December 10, 1800, sects.
1 and 2 (p. 109, ed. of 1805); act of December 23, 1820 (p. 320, ed.
of 1830); Rev. Stats., ch. 229, sec. 21; Mass. Anc. Ch. 144; Plymouth
Colony Laws 35, 263.   In 1791, the sheriff was entitled to seventeen
pence for every trial to be paid with jurors' fees (ed. 1797, p. 116).
By the New Hampshire act of 1698, the crier was entitled to fees for a
trial—3 Prov. Pap. 215—which were probably paid by the plaintiff,
as the sheriff's trial fees were by later statutes.

A jury fee has no tendency to secure the constitutional right of jury
trial, nor to facilitate its exercise, either in civil or criminal cases.
Why would it be an unconstitutional burden, hindrance, and obstruc-
tion in criminal cases of indictment, and not so in civil cases?   Because
in civil cases, being an incident, a burden appurtenant to the right of
jury trial in use when the constitution was framed, it is an incident, a
burden appurtenant to the right of jury trial adopted and secured by
the constitution in civil cases; and in criminal cases of indictment,
not being a burden attached to the jury trial in use when the constitu-
tion was framed, it is not a burden attached to the jury trial adopted
and secured by the constitution in such cases.   This is a perfectly sat-
isfactory application of the historical rule of interpretation; and I do
not now see any other rule of interpretation on which a jury fee can
be held constitutional in civil cases, and unconstitutional in criminal
cases of indictment.

It is evident that very difficult questions might be raised by an in-
crease of the jury fee.   Suppose the legislature should, from this time
forward, annually increase the jury fee to the extent of one dollar or
ten dollars: on what ground could a jury fee of six dollars be held
unconstitutional? on what ground could a jury fee of ten thousand
dollars be held constitutional?   One limit might be the actual com-
pensation of the jury in each particular case; another might be their
reasonable compensation.   Would there be any other limit?   Clearly
there would be.   One other limit would be the amount which could not
be exceeded without impairing the right to a jury trial,—in substance,
the same as that of 1792.   Contrasting the compensation of jurors
and the jury fee of 1792, and previous years, with the present com-
pensation and fee, and considering the changed value of money, and

all the circumstances affecting the practical pecuniary view of the subject, the question would be, whether the present fee was a burden materially greater than the burden attached to the jury trial in use in and before 1792. If it were a materially greater burden, it would be an infringement of the constitutional right; if it were not a materially greater burden, it would not be an infringement of the right. (If I rightly understand the statutes and the practice, the jury trial of 1792 was one in which the jury were paid for their travel by the county, and for the trial of each case, a small fee by the plaintiff or appellant. The system of the jury being paid at all by the public is a recent innovation in England.) The difficulty of applying this historical rule of construction, in case of statutes increasing the compensation of jurors and the jury fee to be paid by the parties, would be chiefly, if not wholly, in investigating certain facts of history and monetary affairs, and not in any matter of legal principle. And if it be objected that the difficulty of deciding by the historical rule of interpretation might be considerable, it is for the objector to answer this question : By what other·rule of interpretation can the difficulties in the question of the constitutionality of an indefinitely increased jury fee be resolved at all ?

The historical rule answers other questions in relation to burdens incident to the right of jury trial. In criminal cases, a person appealing from the judgment of a justice of the peace must enter into recognizance, with sufficient sureties, in a reasonable sum, not exceeding one hundred dollars, for his appearance at the court of appeal, to prosecute his appeal with effect, to abide the order of the court thereon, and to be of good behavior in the meantime, if so required. Gen. Stats., ch. 240, secs. 2, 3. The accused cannot appeal, cannot obtain a jury trial without entering into such a recognizance. *State* v. *White*, 41 N. H. 194. Why is not such a recognizance, especially so far as it relates to his good behavior, an obstruction put in the way of his exercising his constitutional right? Why is he not constitutionally entitled to a jury trial, upon being detained in custody until the time for such trial arrives? Because, in such cases the jury trial of 1792 was one of which such a recognizance was an incident. Act of 1718, secs. 3, 4 (Laws of 1771, pp. 69, 70)—(by this act the appellant was required to pay the clerk's fee for entering the appeal, to pay the jurors their fees, and generally to do what an appellant must do in a civil case) ; acts of July 5, 1776, and April 9, 1777, continuing former laws in force (ed. of 1789, pp. 34, 161) ; judiciary act of Feb. 9, 1791, sec. 4, (ed. of 1797, p. 53); *People* v. *Kennedy*, 2 Parker Cr. Rep. 312, 320 ;—see, also, upon this point, *State* v. *Everett*, 14 Minn. 439 ; *State* v. *Peterson*, 41 Vt. 504, 523 ; *Saco* v. *Wentworth*, 37 Me. 165, 174 ; *Saco* v. *Woodsum*, 39 Me. 258 ; *Green* v. *Briggs*, 1 Curtis C. C. 327, 333, 334 ; *Sullivan* v. *Adams*, 3 Gray 476 ; *Littlefield* v. *Peckham*, 1 R. I. 500, 509.

I have looked in vain for any satisfactory authority which lays down any other conclusive test of the constitutionality of a burden affixed to the right of jury trial than this : if, with the burden, the trial remains, in substance, the same as the jury trial of 1792, the burden is consti-

tutional; otherwise, not.   Other formulas may answer some purposes; other rules, of an introductory or superficial character, may be useful; but the essential, paramount, primary, and final test, in my judgment, must be the historical substance of the jury trial of 1792.   With that test the solution of some questions of this kind may be difficult; without it, the solution of every one of them is impossible.   I entirely agree with Mr. Pomeroy, when he says that " the ultimate test and limit of the constitutional guaranty is to be found in a historical fact "—Sedgwick on St. & Const. Law 488, n, 2d ed.; and that historical fact is the substance of the jury trial of 1792.   A statute regulation that impairs that substance is unreasonable and unconstitutional; a regulation that leaves that substance unimpaired cannot be held by the court to be unreasonable, in the sense of being an infringement of the constitutional right.   By what standard, except the historical substance of the right, can the constitutional reasonableness of a statute regulation of the right be judged?

The exercise of the right may be regulated by legislation: without some legislative regulation of it, or provision for it, it cannot be enjoyed at all.   The constitution merely guarantees the right, and leaves to the legislature the duty of providing the means and methods by which it is to be enjoyed.   The time and place of the trial, the qualifications of jurors, and the manner in which twelve shall be selected for the trial of a case, including all the steps from the *venire* to the challenge, are subjects of legislation, subject to the limitation that the substance of the jury trial of 1792 is preserved, and other constitutional restrictions. *State* v. *Wilson*, 48 N. H. 398 ; *Com.* v. *Dorsey*, 103 Mass. 412 ; *United States* v. *Morris*, 1 Curtis C. C. 23, 37 ; *Stokes* v. *People*, 53 N. Y. 164 ; 1 B. & H. Ld. C. C. 495, 496, 2d ed.; Sedgwick on St. and Const. Law 493, n, 2d ed.

There are cases which hold that the right is not impaired by statutes requiring a party to file an affidavit that he believes he has a good case. *Hunt* v. *Lucas*, 99 Mass. 404; *Biddle* v. *Com.*, 13 S. & R. 405, 410 ; *Flint R. S. Co.* v. *Foster*, 5 Geo. 194 ; *contra*, 2 Greenl. 255.

There are some cases which seem to disregard the standard of the substance of the right of the jury trial in use at the time that right was continued and guaranteed by the constitution, and which afford striking illustrations of the necessity of that standard, and for that reason are of no little value.

*M'Donald* v. *Schell*, 6 S. & R. 240, arose under the Pennsylvania statute of 1810 authorizing compulsory arbitration, and requiring the party appealing from the arbitrator's award to pay his adversary's costs as a condition of appeal.   The arbitrator filed an award in favor of the defendant.   The plaintiff made an affidavit that he was unable, within the time allowed by law for an appeal, to raise a sufficient sum to pay the bill of costs.   The plaintiff argued that to deny an appeal until the payment of costs, which frequently amounted to enormous sums, and to embarrass it with conditions with which a poor man could not comply, effectually deprived him of a trial by jury.   The

court, declining to hear any argument on the other side, held the statute valid, saying,—"The case   *   *   is hardly open to argument, because the court have heretofore decided that an appeal, under the act   *   *   in question, cannot be entered without payment of costs. The law may, undoubtedly, in certain cases, bear so hard on a poor man as almost to deprive him of his appeal. But that will not justify the court in deciding that the law is void. All general laws operate with severity in particular instances."

This decision is a mere statement of the fact that the question had been previously decided. The ground of the previous decision is not alluded to: what it was, when the decision was made, and in what case, I am not informed. If the fact was, that in that class of cases, or in all cases, payment of his adversary's costs was an incident of a party's right of jury trial in 1792 (the date of the constitution), the decision was obviously right. If the fact was otherwise, I cannot see on what ground the decision can be sustained; for the payment of such costs would be a penalty imposed upon the party for demanding his right; and such a penalty is a manifest infringement of the right, an alteration of its substance. The penal character of the condition would not have been more apparent if the statute had expressly declared that the object of the condition was, to obstruct and prevent the exercise of the right. The plaintiff's argument seems to have led the court into the error of supposing that the objection to the provision requiring payment of the adversary's costs is, that a poor man might, in consequence of his inability to pay them, be deprived of a jury trial; whereas the real objection is, that the payment of costs, or anything else required as a penalty for claiming the constitutional right, infringes the right by operating to obstruct its exercise. The constitutional character of the penal obstruction is not affected by the circumstance that the obstruction may be overcome by a rich man, or may not be overcome by a poor man. It is invalid because it is, in law, a penal barrier, and not because, in the path of the poor, it may, in fact, be insurmountable. The facts in *M'Donald* v. *Schell* did indeed present a case of hardship, and put the penal character of the obstruction in an odious light; and, in 1836, the legislature provided for cases of poverty, by enacting that the party, not being the one who took out the rule of compulsory reference, or being unable to pay the costs, might be allowed by the court to appeal without payment. Purdon's Digest Laws (Penn.) 56, 9th ed.

But such legislation is calculated to obscure the constitutional view of the subject, by propagating the idea that a penalty may be imposed upon the exercise of a constitutional right, if the right can possibly be exercised in the impaired and mangled condition to which the penalty reduces it. And the remark of the court in *M'Donald* v. *Schell*, that "all general laws operate with severity in particular cases," seems to show that the real nature of the question was not comprehended. A man may be too infirm to go to the court-house, and too poor to employ an agent to attend to his business there; and for these reasons he

may be unable to enjoy his constitutional right of trial by jury. Such disabilities are not violations of that right. But if the legislature impose the payment of his adversary's costs, or any expense or difficulty not an incident of the jury trial in use when the constitution adopted and continued that mode of trial,—if the burden is imposed not as a necessary means of exercising the right of that trial substantially as it was exercised at that time,—the burden is an unconstitutional penalty, and not the mere misfortune of a general law operating with severity in particular cases.

In *Keddie* v. *Moore*, 2 Murphy (N. C.) 41, it was claimed that the right of trial by jury in cases appealed from a justice (whose jurisdiction had been enlarged), was not preserved for the poor who could not give security for an appeal. This position was not sustained by the court, who said (p. 45),—" So long as the trial by jury is preserved through an appeal, the preliminary mode of obtaining it may be varied at the will and pleasure of the legislature. The party wishing to appeal may be subjected to some inconvenience in getting security ; but this inconvenience does not in this, nor in any other case where security is required, amount to a denial of right." The court here evidently speak of " trial by jury," not as the substance of the particular jury trial in use when the constitution was adopted, but as a trial which might, in some general and loose sense, be called a jury trial, without regard to the historical rule of interpretation ; and the decision, that any inconvenient variation of the historical jury trial of the constitution does not amount to a denial of the constitutional right so long as a jury trial in some indeterminate sense is preserved, is an obvious abolition of the constitution.

In *Vanzant* v. *Waddel*, 2 Yerg. 260, 264, the court say that it had been held that statutes increasing the jurisdiction of justices of the peace, and allowing appeals so that a defendant could not have a jury trial without giving security for the debt, were not unconstitutional.

*Flint River Steamboat Co.* v. *Foster*, 5 Geo. 194, arose under the Georgia statute of 1841, which gave persons employed on any steamboat, on certain rivers, a lien on the boat, to be summarily enforced without a jury trial, unless the owner or manager of the boat pay so much of the claim as he admits to be due, file an affidavit denying that the rest is due, and give bond and good security in the county where the proceedings are had, in double the amount claimed, conditioned for the payment of debt and costs. It was claimed that the right of trial by jury was so clogged by these restrictions as to be virtually denied. But the court held the statute constitutional, saying (p. 208),—" We cannot think the trial by jury substantially defeated by these conditions, though the defendant may, and at times probably will, be subjected to some inconvenience in complying. These terms may be onerous, but this is purely a question of expediency, and one which must, from its very nature, address itself exclusively to the law-maker. And it is difficult to prescribe limits to the power of the legislature in this respect. * * There is no invasion or infringe-

ment of the constitution, so long as trial by jury is not directly or indirectly abolished.    I repeat, it is impossible to say at what point the legislature ought to stop; and if undertaken to be said by the court, it must be at some point of great excess, that such a stand can be made." The court then go on to suggest that it might be well to amend the statute so as to allow the defendant a jury trial if he would make affidavit that he is unable, from poverty, to comply with its terms,—as if the only objection to an obstruction placed in the way of the exercise of the constitutional right were, not its legal character as an obstruction, but the fact that some poor and friendless person might find it impassable,—a doctrine alike destructive of the inviolable rights of all classes of men,—a doctrine that is nothing less than this : we can lawfully violate any constitutional right of the poor and the rich to such an extent as barely leaves it in their power, by the expenditure of their property, to enjoy their violated right.

The decision ignores the historical test, and treats the constitutional jury trial, not as a definite and specific institution, perfectly developed, absolutely fixed, and in actual operation at the date of the constitution, but as an unorganized, unformed, undefined, nebulous, and chaotic generality, that cannot be infringed so long as anything remains that, for any fanciful reasons violating the truth of constitutional history, may be called a jury trial.    Acting upon this theory, the court, of course, found it " impossible to say at what point the legislature ought to stop," and could only declare that, if the court should undertake to withstand an invasion of jury trial, " it must be at some point of great excess that such a stand can be made."    That is the position to which we are necessarily reduced, if we abandon the historical test.    The legislature may violate the constitution a little ; they may violate it considerably ; they may violate it a great deal ; but if they carry the violation " to some point of great excess," then it will be for the court to consider whether that is a point at which " a stand can be made." When any court undertakes to make a stand on that theory, we shall have an opportunity to learn by what legal rules the locality of " some point of great excess " is to be ascertained.

These four cases present the unsound doctrine in so palpable a form as to make them exceedingly valuable.    The first three of them received scarcely any consideration, and they were all decided before the subject had been much discussed in any part of the country, and without the aid of the great light now afforded by the other authorities (to which I have referred), which establish the law in a manner precluding all controversy about the general principles involved.

In the application of these settled principles to particular cases, difficult questions may arise, as well as in the administration of any other branch of the law of the land.    A statute might be of such a character as to raise a great doubt whether its operation would infringe the right to the substance of the jury trial of 1792, or leave that right unimpaired ; whether it would obstruct or facilitate the exercise of that right ; whether it would be a penalty or a regulation.    But in the

cases thus far examined there seems to be no difficulty. If, in a class of criminal cases, at the date of the constitution, a defendant was entitled to a jury trial upon his complying with the single condition of remaining in custody or giving security for his appearance merely as he might elect, his constitutional right would be infringed by such a material alteration of the terms on which he can enjoy the right, as making his enjoyment of it depend upon his paying a jury fee, or the costs of the prosecution, or giving security for his appearance without the option of remaining in custody, or giving security for anything else than his appearance, or incurring the risk of increased punishment, or submitting to anything else that would operate as a penalty for the exercise of the right. If, in a class of civil cases, at the date of the constitution, a defendant was entitled to a jury trial, without giving security for the judgment that might be recovered against him, or paying such part of the claim as he admitted to be due, his constitutional right would be impaired by requiring him to give such security, or to pay what he admitted to be due, as a condition of enjoying his right. His property might be attached and held as security for the judgment, unless he would give security; but a denial of a jury trial, except upon condition of giving security, would be a penalty, and a change in the substance of the jury trial of 1792.

In regard to the general doctrines established by all the cases to which I have referred, I do not suppose there can be any doubt in the mind of any member of the legal profession in this state, or of any citizen who has given the subject any consideration. Upon principle and authority, these doctrines are altogether too clear and elementary to admit of any difference of opinion as to their theoretical soundness. If they are sound, the constitutional guaranty of trial by jury puts a plain limitation upon legislative power; if they are unsound, the constitutional guaranty is a myth. Can these doctrines be practically applied and enforced? Upon that question depends the result of the issue whether we have a constitution or whether we have not.

Applying the settled principles of constitutional construction to the provisions of sec. 13 of the act of 1874, which authorize the court, without the consent of the parties, to commit such a case as this to one or more referees, to be appointed by the court for a trial, I do not see any infringement of the constitutional right of trial by jury. I see no constitutional objection to a compulsory arbitration that has no other effect than to force upon the parties an opportunity to try their case before some other tribunal than a jury. Such an arbitration may be called compulsory; but it is, in fact, nothing more than an effort to adjust a controversy in a court of reconciliation, which, by hearing the parties " at such time and place as may be convenient," and by otherwise conforming to their convenience in a manner impracticable for the more unwieldy tribunal of a court and jury, may be useful to them, whether the proceeding turns out to be satisfactory and therefore final, or unsatisfactory and therefore preliminary.

The authorities are entirely decisive that such a proceeding is not an

infringement of the constitutional right of jury trial, if a reasonably unfettered right of appeal is allowed to a court where the constitutional right in its entirety can be enjoyed. *Plimpton* v. *Somerset*, 33 Vt. 283, 293; *State* v. *Peterson*, 41 Vt. 504, 522, 523, and authorities cited in Sedg. on St. and Const. Law 491, n. 497, 2d ed. ; Cooley's Const. Lim. 410, n., 2d ed. ; 1 B. & H. Ld. C. C. 493, 2d ed. Whether any other part of sec. 13 be held valid or void, so much of it as authorizes the sending of this case to a referee being open to no constitutional objection, and being so distinct and independent that the legislature might well have seen cause to enact it without reference to the validity of any other part of the same section, should, in my opinion, be held valid. 41 N. H. 554, 555 ; *East Kingston* v. *Towle*, 48 N. H. 57, 65 ; *State* v. *Copeland*, 3 R. I. 33, 36 ; *Fisher* v. *McGirr*, 1 Gray 1; *Com.* v. *Clapp*, 5 Gray 100 ; *Com.* v. *Hitchings*, 5 Gray 482, 485, 486 ; *Lincoln* v. *Smith*, 27 Vt. 328, 355 ; *State* v. *Gurney*, 37 Me. 156, 162, 164 ; Cooley Const. Lim. 177–181 ; Sedgwick St. and Const. Law 413, note a.

Further than this it is not necessary for the court to go in the decision of the question now presented by the bill of exceptions in this case. The only exception now before us is to an order that the action be referred. It does not yet appear whether either party will be dissatisfied with the referee's report; whether, if the case is ever tried by a jury, either party will offer the report in evidence, or whether either party will object to its admission.

Whenever a question as to the admissibility and effect of a referee's report in a jury trial is raised, it will be the right of the party raising it to be heard, and not to be precluded by a premature decision made in a case where it is not necessary to make it. As a general rule, a court will not pass upon a constitutional question, unless a decision of it is necessary to the determination of the question presented. Cooley Const. Lim. 163.

But as the constitutional question of the admissibility and effect of the referee's report at a jury trial has been argued in this case, and will undoubtedly be, at some time, again presented for decision; as a decision of it at an early day is desirable for the conduct of business in the circuit court, and a thorough consideration of it, on the part of counsel who may argue it and the judges who may decide it, is demanded by the great practical importance of the question, I deem it fit, at this time, as an individual member of the court, to suggest some aspects of the question which seem to me to deserve an extended and critical examination at the hands of those who may be called upon to discuss it. The subject is of such character and consequence that the judges passing upon it will need all the light that can be furnished by the bar ; and a brief statement of some points which have occurred to me, but which I have not found it necessary nor had time to investigate, may possibly be useful in calling attention to some of the difficulties which must eventually be considered.

The inquiry can, of course, arise only in a case in which there is a constitutional right of jury trial, and not in one of the cases where it had been "otherwise used and practised" before the adoption of the constitution. And in such a case one question will be, not what is a jury trial in a general sense, nor even what was the jury trial of 1792 in all jury cases, but what was the jury trial of 1792 in the particular class of cases like the one under consideration. And the form of this question will dispose of many authorities which would be troublesome if the peculiar form of the question were not strictly observed. For instance, in several jurisdictions, there are various classes of civil and criminal cases in which there is no constitutional right of jury trial, or a right only to a jury trial under certain conditions. *Lincoln* v. *Smith*, 27 Vt. 328, 360 ; *State* v. *Peterson*, 41 Vt. 504, 509, 510 ; *Murphy* v. *The People*, 2 Cow. 815 ; *McGear* v. *Woodruff*, 4 Vroom 213 ; 2 Kent Com. 13, note b ; *People* v. *Kennedy*, 2 Parker Cr. Rep. 312, 318, 319 ; 1 B. & H. Ld. C. C. 493 ; Sedgwick St. and Const. Law 487–491, n. ; Cooley Const. Lim. 410, n. And authorities sustaining the denial of a jury trial, or permitting it only on compliance with those conditions, have no tendency to sustain such a denial or restriction in New Hampshire cases in which no such restrictions were attached to a jury trial at the adoption of the constitution.

Taking a case of the class in which there was, in 1792, a right of jury trial without the introduction of the decision of a different tribunal on the facts in controversy as evidence of all the facts stated in that decision subject to be impeached by either party as provided by the act of 1874, the question is, Would such an introduction of such a decision be an infringement of the right of jury trial enjoyed in 1792 ? Would the influence and effect given to the decision of the auxiliary tribunal, by the act of 1874, tend to secure the right of the jury trial of 1792, or to facilitate the exercise of that right? or, would it tend to discourage, obstruct, and defeat it ? Would it operate as a regulation, promoting, or, at least, not thwarting the object of the constitutional guaranty ? or as a penalty inflicted upon the person claiming the right guaranteed ? Would it invade the substance of the jury trial of 1792 ? or, would it leave that substance unimpaired ?

In order to answer these questions, it will be necessary to ascertain the practical effect intended to be given by the statute to the auxiliary decision introduced in a jury trial. The statute provides that it " shall be evidence of all the facts stated therein, subject to be impeached by either party." This and other language of the 13th section clearly show that the report of the referee under this act is to have the same effect as the report of an auditor in jury trials under the auditor law ; and that is a point settled by authority. "Evidence of all the facts stated therein, subject to be impeached by either party," means, in the natural and ordinary signification of the words, "*prima facie*, in the sense of being conclusive, unless proved to be erroneous by the party impeaching it ;" and such is the meaning as settled by authority. *Stevens* v. *Hall*, 6 N. H. 508, 510 ; *Bellows* v. *Woods*, 18 N. H. 305 ;

*Shoutee* v. *Swindles*, 37 N. H. 559; *Drew* v. *Claggett*, 39 N. H. 431; *Allen* v. *Hawks*, 11 Pick. 359; *Lazarus* v. *Com. Ins. Co.*, 19 Pick. 81, 97; *Taunton I. Co.* v. *Richmond*, 8 Met. 434; *Barnard* v. *Stevens*, 11 Met. 297, 298; *Leathe* v. *Bullard*, 8 Gray 545; *Morgan* v. *Morse*, 13 Gray 150; *Fogg* v. *Farr*, 16 Gray 396; *Lincoln* v. *Taunton C. M. Co.*, 9 Allen 181.

So much being settled, the first inquiry seems to be, whether the auxiliary decision of all the facts in controversy, made a conclusive one, which the jury are bound to follow and adopt unless it is shown to be erroneous, is a modification of the substance of the jury trial of 1792. It is settled that a statute requiring a case to be tried by eleven jurors, or authorizing eleven out of twelve to give a verdict, would be such a modification. By what test of substantiality can an alteration that reduces the number of jurors from twelve to eleven, or allows eleven out of twelve to give a verdict, be held material, and an alteration that anticipates and concludes the judgment of twelve, unless an auxiliary decision is proved erroneous, be held immaterial? Who would not try any ordinary case before a jury of eleven, or be concluded by the judgment of eleven out of twelve, rather than submit to the condition that the unanimous judgment of twelve is concluded by an adverse auxiliary decision unless he proves it to be erroneous,—a condition that turns the jury trial of 1792 into an impeachment of such a decision?

There are authorities which hold (not with perfect unanimity) that the legislature may, by statute, give certain evidence that has a natural tendency to prove a certain fact, the weight of *prima facie* evidence, in criminal cases. *Com.* v. *Williams*, 6 Gray 1; *State* v. *Prescott*, 27 Vt. 194, 199; *Lincoln* v. *Smith*, 27 Vt. 328, 354–358; *State* v. *Hurley*, 54 Me. 562; *State* v. *Cunningham*, 25 Conn. 195.

"*Prima facie*," in criminal cases, means proof beyond all reasonable doubt in the absence of other proof raising a reasonable doubt. If the doctrine of these cases is sound, and if it can be extended to civil cases, it would show that the determination of the weight of evidence that has a natural, inherent, probative force in the ordinary, common-law sense, is an exercise of legislative and not of judicial power, or that it is an exercise of judicial power which the legislature may transfer from the judicial to the legislative branch of the government.

It might be worth while to inquire what judicial power cannot be transferred in the same way, if this doctrine is sound. If the legislature can dictate what evidence the jury shall be permitted to hear, and what conclusions they shall draw from it,—if the legislative power, in this direction, is unlimited,—does it follow that the jury trial of 1792 is not practically a constitutional right? Is the constitutional limit passed when the legislative power is exercised, upon the subject of evidence, or any other subject, in such a manner or to such an extent as to impair the substance of the jury trial of 1792? And from what provision of the constitution does the judicial branch of the government derive the power to abstain either from declaring when that limit

is passed, or from maintaining the supreme law? It may not be necessary, under the act of 1874, to settle the legislative power of assigning a particular, artificial, and arbitrary force and weight to specific items of common-law evidence; but the act seems to raise the question, whether a statute that establishes the conclusion drawn from evidence by a referee, as the verdict of the jury, unless it is shown to be wrong, leaves the substance of the jury trial of 1792 unimpaired.

The legislature may, by regulation of evidence, secure the right or facilitate its exercise; but if they can, by a so-called regulation of evidence, impair in the slightest degree any privilege of the parties that was of the essence of the right at the adoption of the constitution, why can they not carry the usurpation so far as to leave nothing but the slightest remnant of the right? In 1792 the jury were the judges of the weight of the evidence? How much of that duty can be assigned to another tribunal without invading the constitutional province of the jury? But aside from that inquiry, one question is, whether that doctrine can be enlarged into a modification of the jury trial of 1792, anticipating and concluding the judgment of the jury by an auxiliary decision of all the facts in the case, under the name of *prima facie* evidence. Calling the auxiliary decision *prima facie* evidence does not make it anything less than a decision of all facts put in issue by the pleadings,—a verdict forced upon the jury, which they are bound formally to affirm unless it is shown to be erroneous. The subject may be more clearly comprehended if we bring it a little nearer to the light than it is when it is presented by the decision of a referee appointed by the court. If the legislature can authorize the introduction of the decision of such a referee, as provided by the act of 1874, why can they not authorize the judge presiding at the jury trial to act as referee, and give his decision of all the facts the same force and effect as is given to the decision of the referee appointed by the judge? why not in that manner avoid the possible expense of two trials? If the jury trial of 1792 is secured or facilitated, in any constitutional sense, to any constitutional extent, by an auxiliary decision with two trials, why would it not be secured or facilitated, in a better sense and to a greater extent, by such a decision with one trial instead of two? If it is claimed that an auxiliary, itinerant tribunal may try a case at times and places more convenient for the parties than the times and places of the terms of court under the present system, or may, in other respects, give the parties a more convenient trial than the jury trial of 1792, how will it be shown that it is an exercise of legislative power to compel parties to exchange a scintilla of a constitutional right for any amount of convenience? A constitutional right, inconvenient in the highest degree, is as sacred as the most convenient one.

Suppose the presiding justice (required by law to act as the auxiliary tribunal in all civil cases) instructs the jury in this case (as he would be bound to do) that in his judgment the town is guilty, and that they are bound to return his judgment as their verdict unless it is proved

to be erroneous : what is to be done with the authorities that hold it to be " a settled principle of constitutional law that the court are the judges of the law, and the jury judges of the facts involved in the issue " ? *State* v. *Hodge*, 50 N. H. 510, 522, 523, 525. What difference, in constitutional principle, is there between this effect produced by a decision of the judge, and the same effect produced by a decision of a referee appointed by the judge ?

If the jury cannot constitutionally encroach upon the province of the court in deciding the law, how can the court encroach upon the province of the jury in deciding the facts ?   Cooley's Const. Lim. 320, 321, and notes.

Suppose the judge having instructed the jury to return his opinion of the facts as their verdict, unless it were shown to be wrong, the jury, following the example of the jury in *Rex* v. *Woodfall,* 20 State Trials 903–921, return a verdict to this effect,—" The jury find that the opinion of the court, that the defendant is guilty, is not proved to be erroneous, and thereupon assess the plaintiff's damages in the sum of \$1,000 : " what legal defect could be pointed out in such a verdict, if the instructions given by the court were constitutional ?   Did the people of 1792, incorporating the jury trial of that day in the organic law, mean to secure for themselves and their posterity nothing more than a trial in which judgment should be rendered on such a verdict ?

If the auxiliary decision can be made conclusive unless proved to be erroneous by a preponderance of evidence (as provided by the act of 1874), it can, of course, be made conclusive, unless proved to be erroneous beyond all reasonable doubt; and then, by another step in the same direction, it may be made conclusive, unless proved to be erroneous beyond all possible doubt.   Suppose, upon the latter alteration being made, the jury in this case return this verdict,—" The jury find that it is not proved beyond all possible doubt that the decision of the court in favor of the plaintiff on the facts put in issue by the pleadings is erroneous ; and thereupon the jury assess the plaintiff's damages in the sum of \$1,000 : " would that alteration of the jury trial of 1792 leave the substance of that historical trial unimpaired ?   If it would not, where is the point of excessive violation of the constitutional right at which it would be the duty of the court " to make a stand ? "

Suppose a statute requiring the jury to return a verdict in civil or criminal cases, upon the evidence of some officer (appointed by the legislature, or the governor and council, or the court) who should testify, on the stand, that in his opinion the evidence before the jury made out a case on one side or the other, unless the jury were satisfied by a preponderance of evidence, or beyond all reasonable doubt, or beyond all possible doubt, that his opinion was wrong : such a proceeding might, in a certain sense, facilitate the trial ; but would it facilitate the enjoyment of the right of the jury trial of 1792 ? or, would it put an end to the enjoyment of that right ?

Does the question reduce itself to this : Is any limitation of legislative

power established by the constitutional guaranty of trial by jury ?—or this : Can any security for anything be found in the constitution ? If the legislative power can impose a penalty of a feather's weight on the exercise of a constitutional right, what legal principle hinders their imposing a penalty heavy enough to crush every constitutional right, including the boasted great bulwark and palladium of liberty ?

If a preliminary trial, in some cases, facilitates a jury trial by as-certaining the points in dispute ; separating them from other points not in dispute ; eliminating the latter ; attaining the result aimed at by the common-law system of special pleading ; narrowing down a general, promiscuous, and indiscriminate melee to the real points of contention,—I see no constitutional objection to a preliminary trial specially adapted and restricted to that particular purpose, without any encroachment upon the constitutional right, power, or duty of the jury to decide the real points of contention thus previously ascertained. The general issue may be abolished, as it was in many cases by the English rules of 1834. The principle of special pleading may be re-vived and expanded. Minute specifications of the claim of the defence, and of the grounds on which each party relies, may be required. Each may be compelled to state, in plain, untechnical language, and in detail, what he asserts, what he admits, and what he denies. The pleadings may be amended so as to present the real points of contention, when they have been ascertained by the preliminary trial. If any difficulties now exist in narrowing down a controversy to the real points of con-tention, and facilitating a jury trial by distinctly presenting those points alone, the legislature, with the assistance of the legal skill always at their service, the models of ancient and modern English special plead-ing, and the new American codes of procedure, can easily construct a system of pleading and practice, including a preliminary trial (that is, so much of a preliminary trial, specially adapted to this purpose, as may be necessary), that will readily overcome those difficulties. But to transfer to another tribunal (referee, presiding judge, or other offi-cial, who is not a constitutional jury) the constitutional province of the constitutional tribunal to decide the real points of contention ; to exclude the constitutional tribunal from the exercise of its entire power, and the performance of its whole duty as constitutionally fixed in 1792 (by the mere continuance of the well-known and familiar practice of that day) ; to restrict the constitutional tribunal, not to the real points of contention, but to the extraneous, foreign, irrelevant, and impertinent inquiry whether the decision of those points by the other tribunal is shown to be erroneous—is such a proceeding all that the people of New Hampshire meant in 1792, when, by formal, solemn, and repeated constitutional guaranties, they perpetuated the jury trial then in common use ? In what fair and reasonable constitutional sense can such a proceeding be said to facilitate the enjoyment of the right to have the real points of contention (by whatever preliminary steps of trial, pleading, or practice they may be ascertained) passed upon by a jury ? How can it be shown that such a proceeding is not

a transfer of a part (small or great, according to the degree of effect given to the auxiliary decision) of the duty of deciding the real points of contention, from a tribunal to which the constitution assigns that duty, to a tribunal to which the constitution does not assign it?

These questions, and others of a similar kind, seem to be of a searching and fundamental character, and such as are not to be disposed of by astute evasion or general declamation against the expense and inconvenience of allowing people to exercise their constitutional right of trial by jury. If trial by jury be regarded as in many cases expensive, inconvenient, and behind the intelligence of the age, that may show that the constitution requires amendment, but it cannot be amended by an act of the legislature or a decision of the court.

Then, if the provision under consideration cannot be sustained on general constitutional principles, the question will arise whether it is sustained by the principle or authority of the trial-commissioner law of 1853, or the auditor law of 1823. The act of January 7, 1853, authorizing compulsory arbitration (Laws 1852, ch. 1280), took effect March 15, 1853, and might have been applied in actions commenced after its passage, until it was repealed by ch. 2093, Laws 1858. Various questions were raised in four cases referred under that law (with or without the consent of parties). *Rowe* v. *Addison*, 34 N. H. 306; *Dole* v. *Erskine*, 35 N. H. 503; *Chesley* v. *Chesley*, 37 N. H. 229, *Cheever* v. *Scott*, 38 N. H. 32.

How extensively that statute was enforced against the consent of parties; whether in a manner calculated to cause the constitutional question to be raised; whether a party who did not object to the reference of his case to a commissioner waived all objection to the effect given to the result of the reference; the character and cause of the acquiescence in or opposition to its operation; the cause of its repeal; the meaning of its title, "An act to facilitate and render less expensive the proceedings in trials by jury;" and other points in its history and practical construction and operation, of which judicial notice can be taken, will deserve careful consideration.

The first section of the auditor law (which includes the provision giving effect to the auditor's report in a jury trial), which has been in force from 1823 to the present time (Laws 1830, p. 377), appears to have been copied from the Massachusetts act of February 20, 1818, chap. 142. The validity of an act that has been in such extensive operation and universally acquiesced in for fifty years, will probably not be questioned. It is limited to cases in which an investigation of accounts or an examination of vouchers is necessary; and whether the grounds of reason or authority, on which it is applied in that class of cases, are grounds on which it can be extended to cases in which an investigation of accounts or an examination of vouchers is not necessary, is a question to be considered.

The guaranty of the trial by jury is everywhere construed to secure such jury trial only in cases where it could by law have been claimed as a matter of right at the time the constitution was framed. In Wisconsin,

at the date of its constitution, the court might order a compulsory reference in all actions involving the examination of a long account, and therefore a compulsory reference in such cases is held to be constitutional.   Equity has jurisdiction in matters of account that cannot be properly tried by a jury,—the very ground of the equitable jurisdiction being the inadequacy of the remedy at law.   *Mead* v. *Walker*, 17 Wis. *189, *192; *Eastman* v. *Clark*, 53 N. H. 276, 325, 326.   At the time of the separation of this country from England, the courts of equity exercised a concurrent jurisdiction with courts of law, in matters of account, without a jury; and in actions at law, accounts were stated by auditors.   *Board of S.* v. *Dunning*, 20 Wis. *210.   "References as broad as that now contended for by the plaintiffs were sanctioned by statute and practised by the courts long before the adoption of the constitution."   *Lee* v. *Tillotson*, 24 Wend. 337.   A compulsory and conclusive arbitration is unconstitutional.   *People* v. *Haws*, 37 Barb. 440, 455, 456; 15 Abb. (N. Y.) Pr. 115; 24 How. Pr. 148; *Baldwin* v. *Mayor*, 45 Barb. 359; *Rhines* v. *Clark*, 51 Pa. St. 96.

Of the history of the equity jurisdiction in this state, Judge BELL (in *Wells* v. *Pierce*, 27 N. H. 503, 512, 513) says,—"Equity, as a great branch of the law of their native country, was brought over by the colonists, and has always existed as a part of the common law, in its broadest sense, in New Hampshire.   While our territory was under the colonial government of Massachusetts, there is reason to believe that the general court exercised original chancery jurisdiction.   Wash. Jud. Hist. of Mass. 34; Anc. Ch. of Mass. 94.   Under the first royal governor of this province, Robert Mason was appointed chancellor of the province, and among the early records are to be found bills in equity which were heard and decided before him.   1 Belk. Hist. 198, 200.   In 1692, by 'An act for establishing courts of judicature,' it was provided that 'there shall be a court of chancery within this province, which said court shall have power to hear and determine all matters of equity, and shall be esteemed and accounted the high court of chancery of this province; that the governor and council be the said high court of chancery,' etc.   It is not known that this law was ever repealed, and it is supposed that the governor and council, who composed the court of appeals, continued to exercise chancery powers till the revolution.   Equity having thus always constituted a part of the law of New Hampshire, though there was a long period after the revolution when there was no chancery court," principles of the equity branch of the law were acted upon by courts of law to prevent injustice—a practice to which he refers on page 513.   It would seem that Cutts's commission conferred equity jurisdiction on the governor and council—Laws 1771, pp. 2, 3, 302, 303, 305, 1 Prov. Papers 376, 18 M. L. Rep.; and a document in 2 Prov. Papers 342 tends to show that the jurisdiction was recognized in 1701; and the judiciary act of 1692 not being repealed, there seems to be no reason to suppose that the jurisdiction ceased before the revolution.   The researches of Judge BELL brought to light material facts that were unknown to his father when he said, in his

message to the legislature in 1821,—" Our ancestors, who adopted in general the laws of that country from which they originated as the basis of their code, omitted to introduce into practice that part of the system which appertains to chancery jurisdiction."

If Judge PARKER had understood this branch of our provincial history as Chief Justice BELL understood it, it would seem that it would not have been held (as it was, without consideration, in 1738) that the constitution guarantees the right of jury trial in cases within the jurisdiction of chancery. *Marston* v. *Brackett*, 9 N. H. 336, 349; *Hoitt* v. *Burleigh*, 18 N. H. 389. This doctrine seems to be acknowledged nowhere but in New Hampshire. 2 Allen 519; 102 Mass. 45. Mr. Pomeroy says the New Hampshire rule " is purely exceptional, and must depend upon an early practice in that state peculiar to itself." Sedg. St. and Const. Law 489, n., 2d ed. If the court, in 1838, had been aware of the provincial practice, this peculiarity might not have existed; for the circumstance that in 1792 there was no chancery court, and had been none since 1776, might not show conclusively that, for the purposes of this question, Chief Justice BELL was in error in saying that equity has always constituted a part of the law of New Hampshire. The fact, that in the absence of a court of chancery, courts of law acted to a considerable extent, and perhaps as far as their forms of process and procedure would allow, upon the principles of equity, seems to substantiate Judge BELL'S position.

But however this may be, it is apparently immaterial, since, as was held in *Marston* v. *Brackett* and *Hoitt* v. *Burleigh*, the right of jury trial, if there is one in equity, is not a right to go to a jury upon the whole case, but only upon proper issues made up under the direction of the court; and it has never been supposed that a general issue in a bill in equity involving the investigation of long accounts was a proper one to be sent to a jury. I am not aware of any authority for holding that, upon a bill in equity to wind up a partnership, or to settle a trust, the court is bound by the constitution to send to a jury an issue involving the adjustment of an account of ten thousand items, or one thousand, or one hundred. *Lex non cogit ad impossibilia* is a maxim recognized by Judge PARKER (17 N. H. 411); and the impracticability of long, intricate, and complicated accounts being intelligently settled by a jury, under the ordinary conditions of a jury trial, must necessarily be considered by the court in determining what is a proper issue to be sent to a jury when a settlement of such accounts is sought in equity— 7 Pet. 625; and the decisions in *Marston* v. *Brackett* and *Hoitt* v. *Burleigh* not only give no countenance to the idea that there is the same absolute and unlimited right to a jury trial in a case of such accounts as there is in an ordinary case of trespass for assault and battery, but they are inconsistent with that idea.

The auditor law, in providing for a statement of the accounts between the parties, in compelling a discovery by giving judgment as upon default or nonsuit if the parties neglect to render an account, or produce books and papers, or answer pertinent interrogatories on oath,

was an assignment of substantial equity jurisdiction, when it was probably understood here, as it was everywhere else, that there was no absolute right of jury trial in chancery. Equity jurisdiction, in charitable uses, was introduced two years before, by the act of June 21, 1821, ed. of 1824, p. 183, probably upon the suggestion of Governor Bell in his message. The limits of equity jurisdiction of account were not then as definitely fixed as they are now—5 Pet. 495, Story's Eq. Jur., secs. 442–529, Adams's Eq. 222, *Walker* v. *Cheever*, 35 N. H. 339; and there may be reason to doubt whether the auditor law of 1823 was not intended as a mere introduction of equity jurisdiction, with a modified form of equity remedy, and a modification of the jury trial of 1792 in equity cases of account, in which it was supposed there was no constitutional right to that trial.

Governor Bell, in his message to the legislature in 1822, says,—"The law in relation to the powers of auditors, appointed by the superior court in actions of account, requires, it is thought, revision and amendment. In that form of action, the mutual claims and rights of partners, in the ownership and management of property, and those which arise from complicated agencies in the negotiation of business, in which extensive confidence is necessarily placed, mutually, or by one party in the other, may be most conveniently and equitably adjusted. In such cases, where confidence has been misplaced, or disputes arise, great difficulties are experienced in obtaining the evidence necessary to ascertain the rights of the parties, from the circumstance that much of this evidence often rests safely in the knowledge of the parties, or in their private books and papers; and the auditors are not, by the present law, authorized to compel the parties to make the disclosures necessary to a correct knowledge of the facts upon which the decision should depend. I would therefore recommend that the law on this subject be so amended, that auditors may be invested with the power to compel the parties, in causes depending before them, to produce such books and papers, and to answer on oath such interrogatories, relating to the matters in controversy, as may be pertinent and material."

The word "auditor" in the Massachusetts act, from which the first section of our act seems to have been copied, was probably a repetition of the word as used in the action of account at common law. That action, being a tedious and inconvenient proceeding, has now fallen into disuse, but it is a legal remedy where not abolished by statute. 2 Gr. Ev., sec. 34; *Closson* v. *Means*, 40 Me. 337; *Sargent* v. *Parsons*, 12 Mass. 149; 9 Mass. 542; 18 Pick. 229; 8 Cow. 310; 3 Johns. Ch. 361; 5 Binney 433; *Moore* v. *Wilson*, 2 Chipman (Vt.) 91; 37 Vt. 233, 281; 44 Vt. 336; 33 Vt. 290, 291; Com. Dig. *Accompt.* (E. 16); Bac. Abr. *Accompt.*, 1 Ch. Pl. 39, 458; *Scott* v. *M'Intosh*, 2 Camp. N. P. 238; 5 Taunt. 431. The second section of the New Hampshire act of 1823 seems to have been taken from the second of the Massachusetts act of Feb. 17, 1786, entitled "An act for regulating the proceedings in actions of account." The action of account was recognized here in the statute of limitations of June 16, 1791 (ed. 1805, p. 135), and was

extended in certain cases in which it did not lie at common law by the 12th section of the act of Feb. 3, 1789, for settling of testate estates, and by another act of the same date relating to intestate estates. Laws 1805, pp. 165, 175. In Adams's Eq. 224–227, there is a clear statement of the proceedings in the action of account, and of the reason of that form of remedy being superseded by bill in equity.

The title of the Massachusetts auditor law of 1818 is, "An act for facilitating trials in civil causes." The New Hampshire act of 1823 is entitled "An act authorizing the superior court of judicature to appoint auditors in certain cases." There are in Massachusetts decisions some statements (made without any reference to a constitutional question) of the manner in which the auditor law tends to facilitate the trial of cases in which an investigation of accounts is necessary. " The report is to facilitate, not to supersede, jury trials. This it may accomplish in various ways. A claim may consist of a great multitude of small items, to be proved by books and vouchers, and perhaps by an examination of the parties, this being incident to the authority of taking and stating an account. As the report is evidence to the jury, the practical effect will be that the report will be conclusive, except in a few items, or a class of items, depending upon some one general principle. The natural consequence will be, to narrow down the points of controversy before the jury to a small number, easily comprehended, and thus facilitate the trial." Allen v. Hawks, 11 Pick. 359, 361, 362. It is there also said that the parties may go before the auditor, with proof of such items as they may suppose to be undisputed, more safely than before a jury. In Clark v. Fletcher, 1 Allen 53, 55, it is said that the main purpose of the statute was, not to promote the convenience of the parties, but to furnish an important aid in the administration of justice by ascertaining the precise points in controversy, and stating the evidence bearing on them in a clear and condensed form, so that the jury may be able intelligibly to pass upon the issues with facility and without unnecessary loss of time. Judge GILCHRIST says (Brewster v. Edgerly, 13 N. H. 275, 283),—" Where there are vouchers for the payment of money, whose authenticity is to be examined; where there are numerous items of account, upon each of which an issue of fact may arise,—a preliminary examination and report, by a competent auditor, shortens and facilitates the trial, and lessens the expenses of the parties. It was to include such cases that the statute was intended, and not to submit to an auditor questions which the jury can easily and intelligently try." In Connor v. Gas Pipe Co., 40 N. H. 537, 539, the object of relieving the parties from the trouble and expense of being prepared with proof of many items in a jury trial is presented. If compulsory arbitration, with its effect upon the jury trial of 1792 provided by the auditor law and the act of 1874, is to be sustained upon the principle of these authorities, as an auxiliary proceeding that (in a certain sense) facilitates the enjoyment of the constitutional right of jury trial in a manner peculiar to cases of numerous vouchers or items of account, does the whole force of these author-

ities go to show that it cannot be constitutionally applied to a case like the present where it has no such peculiar operation, and, therefore, no such peculiar ground to rest upon ? "The examination of long accounts is the ground upon which a reference is authorized under the state law" of New York. "If the power [compulsory arbitration] exists at all, it may be exercised in every case, and the trial by jury abolished." *U. S.* v. *Rathbone,* 2 Paine C. C. 578, 581, 583.

Do the authorities show that the auditor law facilitates the jury trial of 1792 in any other way, or to any other extent, than by narrowing down to the real points of contention an apparent controversy of several points, some of which are not really in dispute ? So far as a preliminary trial has that effect merely, it may facilitate the constitutional right of having the real points of contention decided by a jury. And if its operation is confined to that object, and if, in accomplishing that object, it does not operate as an obstruction of that right, or a penalty inflicted upon the party claiming it, what constitutional objection does it encounter ? Are there any authorities which hold that the jury trial of 1792 is facilitated, in any constitutional sense, by requiring the jury, unless the auditor's decision of the real points of contention is shown to be erroneous, to return his decision of those points as their verdict ? So far as their decision of those points is affected by his decision of them, is the jury trial of 1792 obstructed and impaired, or secured and facilitated ? And if the effect, given to his decision of those points, upon the jury's decision of them, is inconsistent with the jury trial of 1792, can that part of the auditor law be sustained on any other ground than that in matters of account, understood to be of equity jurisdiction, or affected by the analogies of equity suits, and actions of account referred to auditors at common law, there was not supposed to be the same absolute and unlimited right of jury trial as in many other cases capable of being more conveniently tried by jury ; or on the ground that in cases of accounts the auditor law, having been acquiesced in for fifty years because of its peculiar convenience in that class of cases, is to be considered as settled by the authority of that acquiescence ? If it is sustained on either of these grounds, what force or pertinence has it as a precedent in a case like this, where there is no such peculiar reason and no such exceptional authority to rest upon ?

The well considered case of *Plimpton* v. *Somerset,* 33 Vt. 283, must be regarded as a weighty authority against the introduction of the auxiliary decision in the jury trial of such a case as this.

If these suggestions are of any assistance in opening the way for an adequate discussion of the subject, they will have accomplished their purpose.

CUSHING, C. J. I concur in what I understand to be necessary for the decision of the cause, viz., that that part of sec. 13, ch. 97 of the act of 1874, which provides for committing certain causes to referees for trial, is not in conflict with any part of the constitution of the state of New Hampshire.

SMITH, J.   I concur in the result reached by my brother LADD, and in the views which he has so fully presented.

*Exceptions overruled.*